As several of the Bar's amicinote, we applied the "closely drawn" test to solicitation restrictions in McConnell v. Federal Election Comm'n,540 U.S. 93, 136, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), overruled in part by Citizens United v. Federal Election Comm'n,558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). But the Court in that case determined that the solicitation restrictions operated primarily to prevent circumvention of the contribution limits, which were the subject of the "closely drawn" test in the first place. 540 U.S., at 138-139, 124 S.Ct. 619. McConnelloffers no help to the Bar here, because Florida did not adopt Canon 7C(1) as an anticircumvention measure.
In sum, we hold today what we assumed in White: A State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest.
III
The Florida Bar faces a demanding task in defending Canon 7C(1) against Yulee's First Amendment challenge. We have emphasized that "it is the rare case" in which a State demonstrates that a *1666 speech restriction is narrowly tailored to serve a compelling interest. Burson v. Freeman,504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)(plurality opinion). But those cases do arise. See ibid.;Holder v. Humanitarian Law Project,561 U.S. 1, 25-39, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010); McConnell,540 U.S., at 314, 124 S.Ct. 619(opinion of KENNEDY, J.); cf. Adarand Constructors, Inc. v. Pena,515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)("we wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact' "). Here, Canon 7C(1) advances the State's compelling interest in preserving public confidence in the integrity of the judiciary, and it does so through means narrowly tailored to avoid unnecessarily abridging speech. This is therefore one of the rare cases in which a speech restriction withstands strict scrutiny.
A
The Florida Supreme Court adopted Canon 7C(1) to promote the State's interests in "protecting the integrity of the judiciary" and "maintaining the public's confidence in an impartial judiciary." 138 So.3d, at 385. The way the Canon advances those interests is intuitive: Judges, charged with exercising strict neutrality and independence, cannot supplicate campaign donors without diminishing public confidence in judicial integrity. This principle dates back at least eight centuries to Magna Carta, which proclaimed, "To no one will we sell, to no one will we refuse or delay, right or justice." Cl. 40 (1215), in W. McKechnie, Magna Carta, A Commentary on the Great Charter of King John 395 (2d ed. 1914). The same concept underlies the common law judicial oath, which binds a judge to "do right to all manner of people ... without fear or favour, affection or ill-will," 10 Encyclopaedia of the Laws of England 105 (2d ed. 1908), and the oath that each of us took to "administer justice without respect to persons, and do equal right to the poor and to the rich," 28 U.S.C. § 453. Simply put, Florida and most other States have concluded that the public may lack confidence in a judge's ability to administer justice without fear or favor if he comes to office by asking for favors.
The interest served by Canon 7C(1) has firm support in our precedents. We have recognized the "vital state interest" in safeguarding "public confidence in the fairness and integrity of the nation's elected judges." Caperton v. A.T. Massey Coal Co.,556 U.S. 868, 889, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009)(internal quotation marks omitted). The importance of public confidence in the integrity of judges stems from the place of the judiciary in the government. Unlike the executive or the legislature, the judiciary "has no influence over either the sword or the purse; ... neither force nor will but merely judgment." The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (capitalization altered). The judiciary's authority therefore depends in large measure on the public's willingness to respect and follow its decisions. As Justice Frankfurter once put it for the Court, "justice must satisfy the appearance of justice." Offutt v. United States,348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954). It follows that public perception of judicial integrity is "a state interest of the highest order." Caperton,556 U.S., at 889, 129 S.Ct. 2252(quoting White,536 U.S., at 793, 122 S.Ct. 2528(KENNEDY, J., concurring)).
The principal dissent observes that bans on judicial candidate solicitation lack a lengthy historical pedigree. Post,at 1676 (opinion of SCALIA, J.). We do not dispute that fact, but it has no relevance here. As the precedent cited by the principal dissent demonstrates, a history and *1667 tradition of regulation are important factors in determining whether to recognize "new categories of unprotected speech." Brown v. Entertainment Merchants Assn.,564 U.S. ----, ----, 131 S.Ct. 2729, 2734, 180 L.Ed.2d 708 (2011); see post, at 1676. But nobody argues that solicitation of campaign funds by judicial candidates is a category of unprotected speech. As explained above, the First Amendment fully applies to Yulee's speech. The question is instead whether that Amendment permits the particular regulation of speech at issue here.
The parties devote considerable attention to our cases analyzing campaign finance restrictions in political elections. But a State's interest in preserving public confidence in the integrity of its judiciary extends beyond its interest in preventing the appearance of corruption in legislative and executive elections. As we explained in White,States may regulate judicial elections differently than they regulate political elections, because the role of judges differs from the role of politicians. 536 U.S., at 783, 122 S.Ct. 2528; id.,at 805, 122 S.Ct. 2528(GINSBURG, J., dissenting). Politicians are expected to be appropriately responsive to the preferences of their supporters. Indeed, such "responsiveness is key to the very concept of self-governance through elected officials." McCutcheon v. Federal Election Comm'n,572 U.S. ----, ----, 134 S.Ct. 1434, 1462, 188 L.Ed.2d 468 (2014)(plurality opinion). The same is not true of judges. In deciding cases, a judge is not to follow the preferences of his supporters, or provide any special consideration to his campaign donors. A judge instead must "observe the utmost fairness," striving to be "perfectly and completely independent, with nothing to influence or controul him but God and his conscience." Address of John Marshall, in Proceedings and Debates of the Virginia State Convention of 1829-1830, p. 616 (1830). As in White,therefore, our precedents applying the First Amendment to political elections have little bearing on the issues here.
The vast majority of elected judges in States that allow personal solicitation serve with fairness and honor. But "[e]ven if judges were able to refrain from favoring donors, the mere possibility that judges' decisions may be motivated by the desire to repay campaign contributions is likely to undermine the public's confidence in the judiciary." White,536 U.S., at 790, 122 S.Ct. 2528(O'Connor, J., concurring). In the eyes of the public, a judge's personal solicitation could result (even unknowingly) in "a possible temptation ... which might lead him not to hold the balance nice, clear and true." Tumey v. Ohio,273 U.S. 510, 532, 47 S.Ct. 437, 71 L.Ed. 749 (1927). That risk is especially pronounced because most donors are lawyers and litigants who may appear before the judge they are supporting. See A. Bannon, E. Velasco, L. Casey, & L. Reagan, The New Politics of Judicial Elections: 2011-12, p. 15 (2013).
The concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record. But no one denies that it is genuine and compelling. In short, it is the regrettable but unavoidable appearance that judges who personally ask for money may diminish their integrity that prompted the Supreme Court of Florida and most other States to sever the direct link between judicial candidates and campaign contributors. As the Supreme Court of Oregon explained, "the spectacle of lawyers or potential litigants directly handing over money to judicial candidates should be avoided if the public is to have faith in the impartiality of its judiciary."
*1668 In re Fadeley,310 Ore. 548, 565, 802 P.2d 31, 41 (1990). Moreover, personal solicitation by a judicial candidate "inevitably places the solicited individuals in a position to fear retaliation if they fail to financially support that candidate." Simes,368 Ark., at 585, 247 S.W.3d, at 882. Potential litigants then fear that "the integrity of the judicial system has been compromised, forcing them to search for an attorney in part based upon the criteria of which attorneys have made the obligatory contributions." Ibid.A State's decision to elect its judges does not require it to tolerate these risks. The Florida Bar's interest is compelling.
B
Yulee acknowledges the State's compelling interest in judicial integrity. She argues, however, that the Canon's failure to restrict other speech equally damaging to judicial integrity and its appearance undercuts the Bar's position. In particular, she notes that Canon 7C(1) allows a judge's campaign committee to solicit money, which arguably reduces public confidence in the integrity of the judiciary just as much as a judge's personal solicitation. Yulee also points out that Florida permits judicial candidates to write thank you notes to campaign donors, which ensures that candidates know who contributes and who does not.
It is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging too littlespeech. We have recognized, however, that underinclusiveness can raise "doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." Brown,564 U.S., at ----, 131 S.Ct., at 2740. In a textbook illustration of that principle, we invalidated a city's ban on ritual animal sacrifices because the city failed to regulate vast swaths of conduct that similarly diminished its asserted interests in public health and animal welfare. Church of Lukumi Babalu Aye, Inc. v. Hialeah,508 U.S. 520, 543-547, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).
Underinclusiveness can also reveal that a law does not actually advance a compelling interest. For example, a State's decision to prohibit newspapers, but not electronic media, from releasing the names of juvenile defendants suggested that the law did not advance its stated purpose of protecting youth privacy. Smith v. Daily Mail Publishing Co.,443 U.S. 97, 104-105, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979).
Although a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding "underinclusiveness limitation." R.A.V. v. St. Paul,505 U.S. 377, 387, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)(internal quotation marks omitted). A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns. We have accordingly upheld laws-even under strict scrutiny-that conceivably could have restricted even greater amounts of speech in service of their stated interests. Burson,504 U.S., at 207, 112 S.Ct. 1846; see McConnell,540 U.S., at 207-208, 124 S.Ct. 619; Metromedia, Inc. v. San Diego,453 U.S. 490, 511-512, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981)(plurality opinion); Buckley,424 U.S., at 105, 96 S.Ct. 612.
Viewed in light of these principles, Canon 7C(1) raises no fatal underinclusivity concerns. The solicitation ban aims squarely at the conduct most likely to undermine public confidence in the integrity of the judiciary: personal requests for money by judges and judicial candidates. The Canon applies evenhandedly to all judges and judicial candidates, regardless of their viewpoint or chosen means of solicitation.
*1669 And unlike some laws that we have found impermissibly underinclusive, Canon 7C(1) is not riddled with exceptions. See City of Ladue v. Gilleo,512 U.S. 43, 52-53, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). Indeed, the Canon contains zero exceptions to its ban on personal solicitation.
Yulee relies heavily on the provision of Canon 7C(1) that allows solicitation by a candidate's campaign committee. But Florida, along with most other States, has reasonably concluded that solicitation by the candidate personally creates a categorically different and more severe risk of undermining public confidence than does solicitation by a campaign committee. The identity of the solicitor matters, as anyone who has encountered a Girl Scout selling cookies outside a grocery store can attest. When the judicial candidate himself asks for money, the stakes are higher for all involved. The candidate has personally invested his time and effort in the fundraising appeal; he has placed his name and reputation behind the request. The solicited individual knows that, and also knows that the solicitor might be in a position to singlehandedly make decisions of great weight: The same person who signed the fundraising letter might one day sign the judgment. This dynamic inevitably creates pressure for the recipient to comply, and it does so in a way that solicitation by a third party does not. Just as inevitably, the personal involvement of the candidate in the solicitation creates the public appearance that the candidate will remember who says yes, and who says no.
In short, personal solicitation by judicial candidates implicates a different problem than solicitation by campaign committees. However similar the two solicitations may be in substance, a State may conclude that they present markedly different appearances to the public. Florida's choice to allow solicitation by campaign committees does not undermine its decision to ban solicitation by judges.
Likewise, allowing judicial candidates to write thank you notes to campaign donors does not detract from the State's interest in preserving public confidence in the integrity of the judiciary. Yulee argues that permitting thank you notes heightens the likelihood of actual bias by ensuring that judicial candidates know who supported their campaigns, and ensuring that the supporter knows that the candidate knows. Maybe so. But the State's compelling interest is implicated most directly by the candidate's personal solicitation itself. A failure to ban thank you notes for contributions not solicited by the candidate does not undercut the Bar's rationale.
In addition, the State has a good reason for allowing candidates to write thank you notes and raise money through committees. These accommodations reflect Florida's effort to respect the First Amendment interests of candidates and their contributors-to resolve the "fundamental tension between the ideal character of the judicial office and the real world of electoral politics." Chisom v. Roemer,501 U.S. 380, 400, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). They belie the principal dissent's suggestion that Canon 7C(1) reflects general "hostility toward judicial campaigning" and has "nothing to do with the appearances created by judges' asking for money." Post, at 1681. Nothing?
The principal dissent also suggests that Canon 7C(1) is underinclusive because Florida does not ban judicial candidates from asking individuals for personal gifts or loans. Post,at 1680. But Florida law treats a personal "gift" or "loan" as a campaign contribution if the donor makes it "for the purpose of influencing the results of an election," Fla. Stat. § 106.011(5)(a), and Florida's Judicial *1670 Qualifications Commission has determined that a judicial candidate violates Canon 7C(1) by personally soliciting such a loan. See In re Turner,76 So.3d 898, 901-902 (Fla.2011). In any event, Florida can ban personal solicitation of campaign funds by judicial candidates without making them obey a comprehensive code to leading an ethical life. Underinclusivity creates a First Amendment concern when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest in a comparable way. See Florida Star v. B.J.F.,491 U.S. 524, 540, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989). The principal dissent offers no basis to conclude that judicial candidates are in the habit of soliciting personal loans, football tickets, or anything of the sort. Post,at 1680. Even under strict scrutiny, "[t]he First Amendment does not require States to regulate for problems that do not exist." Burson,504 U.S., at 207, 112 S.Ct. 1846(State's regulation of political solicitation around a polling place, but not charitable or commercial solicitation, was not fatally underinclusive under strict scrutiny).
Taken to its logical conclusion, the position advanced by Yulee and the principal dissent is that Florida may ban the solicitation of funds by judicial candidates only if the State bans allsolicitation of funds in judicial elections. The First Amendment does not put a State to that all-or-nothing choice. We will not punish Florida for leaving open more, rather than fewer, avenues of expression, especially when there is no indication that the selective restriction of speech reflects a pretextual motive.
C
After arguing that Canon 7C(1) violates the First Amendment because it restricts too little speech, Yulee argues that the Canon violates the First Amendment because it restricts too much. In her view, the Canon is not narrowly tailored to advance the State's compelling interest through the least restrictive means. See United States v. Playboy Entertainment Group, Inc.,529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).
By any measure, Canon 7C(1) restricts a narrow slice of speech. A reader of Justice KENNEDY's dissent could be forgiven for concluding that the Court has just upheld a latter-day version of the Alien and Sedition Acts, approving "state censorship" that "locks the First Amendment out," imposes a "gag" on candidates, and inflicts "dead weight" on a "silenced" public debate. Post,at 1676 - 1677. But in reality, Canon 7C(1) leaves judicial candidates free to discuss any issue with any person at any time. Candidates can write letters, give speeches, and put up billboards. They can contact potential supporters in person, on the phone, or online. They can promote their campaigns on radio, television, or other media. They cannot say, "Please give me money." They can, however, direct their campaign committees to do so. Whatever else may be said of the Canon, it is surely not a "wildly disproportionate restriction upon speech." Post, at 1676 (SCALIA, J., dissenting).
Indeed, Yulee concedes-and the principal dissent seems to agree, post,at 1679-that Canon 7C(1) is valid in numerous applications. Yulee acknowledges that Florida can prohibit judges from soliciting money from lawyers and litigants appearing before them. Reply Brief 18. In addition, she says the State "might" be able to ban "direct one-to-one solicitation of lawyers and individuals or businesses that could reasonably appear in the court for which the individual is a candidate." Ibid. She also suggests that the Bar could forbid "in person" solicitation by judicial candidates. Tr. of Oral Arg. 7; cf. Ohralik v.
*1671 Ohio State Bar Assn.,436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978)(permitting State to ban in person solicitation of clients by lawyers). But Yulee argues that the Canon cannot constitutionally be applied to her chosen form of solicitation: a letter posted online and distributed via mass mailing. No one, she contends, will lose confidence in the integrity of the judiciary based on personal solicitation to such a broad audience.
This argument misperceives the breadth of the compelling interest that underlies Canon 7C(1). Florida has reasonably determined that personal appeals for money by a judicial candidate inherently create an appearance of impropriety that may cause the public to lose confidence in the integrity of the judiciary. That interest may be implicated to varying degrees in particular contexts, but the interest remains whenever the public perceives the judge personally asking for money.
Moreover, the lines Yulee asks us to draw are unworkable. Even under her theory of the case, a mass mailing would create an appearance of impropriety if addressed to a list of all lawyers and litigants with pending cases. So would a speech soliciting contributions from the 100 most frequently appearing attorneys in the jurisdiction. Yulee says she might accept a ban on one-to-one solicitation, but is the public impression really any different if a judicial candidate tries to buttonhole not one prospective donor but two at a time? Ten? Yulee also agrees that in person solicitation creates a problem. But would the public's concern recede if the request for money came in a phone call or a text message?
We decline to wade into this swamp. The First Amendment requires that Canon 7C(1) be narrowly tailored, not that it be "perfectly tailored." Burson,504 U.S., at 209, 112 S.Ct. 1846. The impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary. Yulee is of course correct that some personal solicitations raise greater concerns than others. A judge who passes the hat in the courthouse creates a more serious appearance of impropriety than does a judicial candidate who makes a tasteful plea for support on the radio. But most problems arise in greater and lesser gradations, and the First Amendment does not confine a State to addressing evils in their most acute form. See id.,at 210, 112 S.Ct. 1846. Here, Florida has concluded that all personal solicitations by judicial candidates create a public appearance that undermines confidence in the integrity of the judiciary; banning all personal solicitations by judicial candidates is narrowly tailored to address that concern.
In considering Yulee's tailoring arguments, we are mindful that most States with elected judges have determined that drawing a line between personal solicitation by candidates and solicitation by committees is necessary to preserve public confidence in the integrity of the judiciary. These considered judgments deserve our respect, especially because they reflect sensitive choices by States in an area central to their own governance-how to select those who "sit as their judges." Gregory v. Ashcroft,501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).
Finally, Yulee contends that Florida can accomplish its compelling interest through the less restrictive means of recusal rules and campaign contribution limits. We disagree. A rule requiring judges to recuse themselves from every case in which a lawyer or litigant made a campaign contribution would disable many jurisdictions. And a flood of postelection recusal motions could "erode public confidence in judicial *1672 impartiality" and thereby exacerbate the very appearance problem the State is trying to solve. Caperton,556 U.S., at 891, 129 S.Ct. 2252(ROBERTS, C.J., dissenting). Moreover, the rule that Yulee envisions could create a perverse incentive for litigants to make campaign contributions to judges solely as a means to trigger their later recusal-a form of peremptory strike against a judge that would enable transparent forum shopping.
As for campaign contribution limits, Florida already applies them to judicial elections. Fla. Stat. § 106.08(1)(a). A State may decide that the threat to public confidence created by personal solicitation exists apart from the amount of money that a judge or judicial candidate seeks. Even if Florida decreased its contribution limit, the appearance that judges who personally solicit funds might improperly favor their campaign donors would remain. Although the Court has held that contribution limits advance the interest in preventing quid pro quocorruption and its appearance in political elections, we have never held that adopting contribution limits precludes a State from pursuing its compelling interests through additional means. And in any event, a State has compelling interests in regulating judicial elections that extend beyond its interests in regulating political elections, because judges are not politicians.
In sum, because Canon 7C(1) is narrowly tailored to serve a compelling government interest, the First Amendment poses no obstacle to its enforcement in this case. As a result of our decision, Florida may continue to prohibit judicial candidates from personally soliciting campaign funds, while allowing them to raise money through committees and to otherwise communicate their electoral messages in practically any way. The principal dissent faults us for not answering a slew of broader questions, such as whether Florida may cap a judicial candidate's spending or ban independent expenditures by corporations. Post, at 1679 - 1680. Yulee has not asked these questions, and for good reason-they are far afield from the narrow regulation actually at issue in this case.
We likewise have no cause to consider whether the citizens of States that elect their judges have decided anything about the "oracular sanctity of judges" or whether judges are due "a hearty helping of humble pie." Post,at 1682. The principal dissent could be right that the decision to adopt judicial elections "probably springs," at least in part, from a desire to make judges more accountable to the public, ibid., although the history on this matter is more complicated. See J. Shugerman, The People's Courts, at 5 (arguing that States adopted judicial elections to increase judicial independence). In any event, it is a long way from general notions of judicial accountability to the principal dissent's view, which evokes nothing so much as Delacroix's painting of Liberty leading a determined band of citoyens,this time against a robed aristocracy scurrying to shore up the ramparts of the judicial castle through disingenuous ethical rules. We claim no similar insight into the People's passions, hazard no assertions about ulterior motives of those who promulgated Canon 7C(1), and firmly reject the charge of a deceptive "pose of neutrality" on the part of those who uphold it. Post,at 1682.
* * *
The desirability of judicial elections is a question that has sparked disagreement for more than 200 years. Hamilton believed that appointing judges to positions with life tenure constituted "the best expedient which can be devised in any government to secure a steady, upright, and impartial administration of the laws." The *1673 Federalist No. 78, at 465. Jefferson thought that making judges "dependent on none but themselves" ran counter to the principle of "a government founded on the public will." 12 The Works of Thomas Jefferson 5 (P. Ford ed. 1905). The federal courts reflect the view of Hamilton; most States have sided with Jefferson. Both methods have given our Nation jurists of wisdom and rectitude who have devoted themselves to maintaining "the public's respect ... and a reserve of public goodwill, without becoming subservient to public opinion." Rehnquist, Judicial Independence, 38 U. Rich. L.Rev. 579, 596 (2004).
It is not our place to resolve this enduring debate. Our limited task is to apply the Constitution to the question presented in this case. Judicial candidates have a First Amendment right to speak in support of their campaigns. States have a compelling interest in preserving public confidence in their judiciaries. When the State adopts a narrowly tailored restriction like the one at issue here, those principles do not conflict. A State's decision to elect judges does not compel it to compromise public confidence in their integrity.
The judgment of the Florida Supreme Court is
Affirmed.