**Colin R. BRICKMAN, Plaintiff,**

v.

**FACEBOOK, INC., Defendant.**

**Case No. 16–cv–00751–TEH**

United States District Court, N.D. California.

Signed 01/27/2017

Frank A. Bartela, Patrick J. Perotti, Dworken & Bernstein Co., L.P.A., Painesville, OH, Kristen Law Sagafi, Tycko & Zavareei LLP, Oakland, CA, Hassan Ali Zavareei, Tycko & Zavareei LLP, Washington, DC, for Plaintiff.

Elizabeth L. Deeley, Kristin I Sheffield–Whitehead, Kirkland & Ellis LLP, San Francisco, CA, Andrew Brian Clubok, Kirkland & Ellis LLP, New York, NY, Devin Scott Anderson, Susan E. Engel, Kirkland & Ellis LLP, Washington, DC, for Defendant.

**ORDER DENYING FACEBOOK'S MOTION TO DISMISS**

THELTON E. HENDERSON, United States District Judge

On August 9, 2016, Facebook filed a motion to dismiss Brickman's First Amended Complaint ("FAC") under Fed. R. Civ. P. 12(b)(6). ECF No. 50. Pursuant to Fed. R. Civ. P. 5.1, Facebook also filed a Notice of Constitutional Question to the Attorney General of the United States. ECF No. 51. And pursuant to Fed. R. Civ. P. 5.1(c), the United States intervened in the case for the limited purpose of defending the constitutionality of the TCPA. ECF No. 62. Brickman and the United States timely opposed Facebook's motion to dismiss, ECF Nos. 55, 63; and Facebook timely replied. ECF No. 64. On September 11, 2016, the Court requested supplemental briefing from both Brickman and Facebook addressing whether the TCPA and its exceptions would pass strict scrutiny. *See* ECF No. 68. Both parties submitted supplemental briefing. ECF Nos. 71–72. A hearing was held on Facebook's motion on January 23, 2017. After carefully considering the parties' written and oral arguments, the Court DENIES Facebook's motion for the reasons set forth below.

## I. BACKGROUND

The following factual allegations are taken from Plaintiff Brickman's First Amended Complaint ("FAC"), unless otherwise stated, and are therefore accepted as true for the purposes of this motion. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Defendant Facebook, Inc. ("Facebook") owns and operates the online social networking service, www.facebook.com. ECF No. 43. ("FAC") ¶ 5. There are more than 156 million Facebook users in the United States, and more than 2 billion worldwide. *Id.* While Facebook does not own factories, physical product inventory, or saleable goods, it generates revenue from the activities of Facebook users. *Id.* ¶ 19. In fact, in its investment publications, Facebook defines each time a user engages on the Facebook platform as a "revenue-generating activity." *Id.* ¶ 20. In an effort to increase user traffic, which in turn drives Facebook's advertising revenue, Facebook

sent out "Birthday Announcements Texts" to cell phones of Facebook users inviting them to engage with the Facebook platform. *Id.* ¶ 5.

Facebook employed computer software to send Birthday Announcement Texts to users. *Id.* ¶ 67. Facebook's computer system, without any human intervention, reviews user data on a daily basis to identify users who have birthdays on a particular day; identifies the user's Facebook friends who will receive the Birthday Text Announcement Texts for a particular user's birthday; identifies the phone numbers of the Facebook friends that will receive the message; automatically inserts the name of the user celebrating a birthday into a form text in the appropriate language for each of the user's Facebook friends, creates the Birthday Announcement Text; compiles a list of cell phone numbers to which it will send Birthday Text Announcements, stores those cell phone numbers in a queue, and then sends the text messages from that queue. *Id.* ¶¶ 66–73.

On or about December 15, 2015, Facebook, through its short code SMS number 32665033, texted Brickman's cell phone number an unsolicited Birthday Announcement Text stating "Today is Jim Stewart's birthday. Reply to post a wish on his Timeline or reply with 1 to post 'Happy Birthday!'". *Id.* ¶ 84. Although Brickman supplied Facebook his cell phone number, which is associated to his Facebook page, Brickman indicated in the Notification Settings of his Facebook account, prior to receiving the text message, that he did not want to receive any text messages from Facebook, and also did not activate text messaging for his cell phone. ¶¶ 2, 36, 79–82, 85. On February 2, 2016, Brickman filed a putative class action suit against Facebook, alleging that Facebook violates the Telephone Consumer Protection Act ("TCPA") by sending unauthorized text messages. ECF No. 1. He seeks to represent the following class: "All individuals who received one or more Birthday Announcement Texts from Defendant to a cell phone through the use of an automated telephone dialing system at any time without their consent." FAC ¶ 97.

## II. LEGAL STANDARD

Dismissal is appropriate under Fed. R. Civ. P. 12(b)(6) when a plaintiff's allegations fail to "state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). Specifically, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In ruling on a motion to dismiss, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. L.A. Cty.,* 487 F.3d 1246, 1249 (9th Cir. 2007). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (citation omitted). Dismissal of claims that fail to meet this standard should be with leave to amend, unless it is clear that amendment could not possibly cure the complaint's deficiencies. *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1298 (9th Cir. 1998).

## III. DISCUSSION

### 1. Brickman has Sufficiently Alleged a Violation of the TCPA.

A valid TCPA claim requires plaintiff to allege (1) Defendant called a

cellular telephone number; (2) using an automated telephone dialing system ("ATDS"); and (3) without the recipient's prior express consent. *Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1043 (9th Cir. 2012). A text message is a "call" within the meaning of the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). The TCPA defines an automated telephone dialing system as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." 47 U.S.C. § 227(a)(1). The Ninth Circuit has determined this meaning to be "clear and unambiguous," *Satterfield*, 569 F.3d at 951, and has clarified that in analyzing whether a device is an ATDS the Court's "focus must be on whether the equipment has the *capacity* to store or produce telephone numbers to be called, using a random or sequential number generator." *Meyer*, 707 F.3d at 1043. Therefore, "a system need not actually store, produce, or call randomly or sequentially generated telephone numbers; it need only have the capacity to do it." *Id.* (quoting *Satterfield*, 569 F.3d at 951).

Additionally, pursuant to its authority to "prescribe regulations to implement the requirements" of the Act's prohibitions, 47 U.S.C. § 227(b)(2), the Federal Communications Commission ("FCC") has issued a number of declaratory rulings on whether particular equipment qualifies as an ATDS. For example, the FCC has stated the basic functions of an ATDS are to "dial numbers without human intervention" and to "dial thousands of numbers in a short period of time," *In re Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7975 (2015) ("2015 FCC Order"), and has also clarified that the ATDS definition "covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention

regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 15391, 15392 n. 5 (2012) (emphasis in original) ("2012 FCC Order"). Moreover, the FCC has clarified that "[h]ow the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination." 2015 FCC Order, at 7975. "This [C]ourt is bound by the FCC's interpretations of the TCPA, unless those interpretations are invalidated by a court of appeals". *Reardon v. Uber Technologies, Inc.*, 115 F.Supp.3d 1090, 1097 (N.D. Cal. 2015) (citing 28 U.S.C. § 2342 *et seq.* and *Pac. Bell v. Pac–West Telecomm, Inc.*, 325 F.3d 1114, 1125 (9th Cir. 2003)).

Here, Brickman alleges that Facebook employs computer software to send "Birthday Announcement Texts" without human intervention to users. FAC ¶ 67. More specifically, Brickman alleges Facebook's computer system, without any human intervention, reviews user data on a daily basis to identify users who have birthdays on a particular day; identifies the users' Facebook friends who will receive the Birthday Text Announcement Texts for a particular user's birthday; identifies the cell phone numbers of the Facebook friends that will receive the message; automatically inserts the name of the user celebrating a birthday into a form text in the appropriate language for each of the user's Facebook friends, creates the Birthday Announcement Text; compiles a list of cell phone numbers to which it will send Birthday Text Announcements, stores those cell phone numbers in a queue, and then causes the text messages to be sent from that queue. *Id.* ¶¶ 66–73. Brickman

argues the alleged computer system is an ATDS because such a system has the capacity to store and dial telephone numbers without human intervention; and also because the system has the capacity to store or produce telephone numbers using a random or sequential number generator, and to dial telephone numbers without human intervention. *Id.* ¶¶ 74–75.

In contrast, Facebook contends Brickman has not sufficiently alleged a TCPA claim because the content of the birthday message and the context of the alleged birthday message, along with the absence of other messages, supports a finding that the text was the result of direct targeting following human intervention. ECF No. 50 ("Mot.") at 8:7–10. In support of this, Defendants rely heavily on *Duguid v. Facebook, Inc.*, No. 15-cv-00985-JST, 2016 WL 1169365, at *5 (N.D. Cal. Mar. 24, 2016), where the court examined whether a plaintiff had plausibly alleged a violation of the TCPA. The plaintiff there alleged that although he never provided his cell phone number to Facebook nor did he authorize it to send him messages, he had received text messages from an SMS short code licensed to and operated by Facebook, using the following template: "Your Facebook account was accessed from [internet browser] at [time]. Log in for more info." *Id.* at *1. The plaintiff also made a conclusory allegation that the text messages "were made with an ATDS" and that the "ATDS has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator." *Id.* In determining whether the plaintiff's conclusory allegation supported a claim for relief under the TCPA, the court analyzed "the content of the message, the context in which it was received, and the existence of similar messages." *Id.* at *5. In doing so, the court dismissed the plaintiff's TCPA claim because his "allegations suggest[ed] that Facebook's login notification messages [were] targeted to specific phone numbers and [were] triggered by attempts to log in to Facebook accounts associated with those phone numbers." *Id.*

Facebook argues that *Duguid* warrants the same outcome here. First, Facebook argues the content of the message shows the text message was specifically targeted to Brickman because it identified a specific individual, with a specific connection to plaintiff, relating to a specific event on a specific date. Mot. at 9:23–27. And while Brickman alleges the use of a fill-in-the-blank template, Facebook argues such a template is strong evidence of the sort of specific targeting inconsistent with the use an ATDS. *Id.* at 9:27–10:3. Second, in regard to the context of the message, Facebook argues the message does not suggest a generic marketing message that was sent en masse with an ATDS. Mot. at 10:17–18. Again, this is because Facebook's message was geared to a particular plaintiff about a particular event and because it was not a telemarketing advertisement. Mot. at 18–24. Lastly, Facebook argues that because Brickman received the birthday text only once, the message is fully consistent with direct targeting and cuts against a finding that Facebook used an ATDS. Mot. at 2–5.

■ While the call is certainly a close one, viewing Brickman's allegations in the light most favorable to him, this Court finds he has alleged enough to support a TCPA claim against Facebook. First, in contrast to the plaintiff in *Duguid,* here, Brickman has alleged more than a conclusory allegation that Facebook used an ATDS to send out text messages—he has alleged exactly how Facebook's software determines who to text, how it gathers the contact information needed to send out texts, how it creates text messages, and how it sends them out, all without human intervention. Such equipment falls within the FCC's definition of an ATDS, as the

alleged equipment would have the "capacity to generate numbers and dial them without human intervention" even if the numbers came from a calling list. *See* 2015 FCC Order, at 8077. Second, here, peripheral considerations such as the content of Facebook's text message, the context of the Facebook's text message, and the existence of similar messages do not preclude a finding that Facebook employed an ATDS to send out the Birthday Announcement Texts. While Facebook's Birthday Announcement Texts do suggest direct targeting of Brickman, based on the facts alleged it is plausible that Facebook could have used an ATDS to send out the targeted messages. This is especially true in a situation like this where Brickman alleges Facebook possessed the particular information and technology needed to craft such targeted messages (i.e., cell phone numbers, users' birthdays, friendship connections, etc.).[1] *See* FAC ¶ 67.

Facebook also attempts to strike down Brickman's TCPA claim by arguing it was triggered by human intervention. Mot. at 12–14. Facebook argues the Birthday Announcement Text was triggered by human intervention because the following steps were taken: Brickman signed up for Facebook; linked his cell phone number to his profile; befriended Mr. Stewart on Facebook, who himself entered his birth date; and then decided to share that date with his Facebook friends. Mot. at 13:18–25. As mentioned above, whether human intervention exists is a case-by-case determination that requires the Court to analyze "how the equipment functions and depends on human intervention." 2015 FCC Order, at 7975. In other words, the FCC requires the Court to determine to what extent

human intervention is the impetus for the transmission of the challenged message. *Sherman v. Yahoo! Inc.*, 150 F.Supp.3d 1213, 1217 (S.D. Cal. 2015). Considering the allegations put forth in Brickman's FAC and viewing them in the light most favorable to him, the Court finds that Brickman's and Mr. Stewart's actions were not the impetus for Facebook sending the Birthday Announcement Text. This is particularly true where Brickman alleges he gave Facebook his cell phone number but that his account settings gave Facebook "unambiguous notice" that it did not have consent to send him text messages. FAC ¶¶ 2, 78. Also, the FCC has stated equipment may be considered an ATDS regardless of whether the numbers come from a calling list. 2015 FCC Order, at 8077. This FCC interpretation would mean nothing if merely adding phone numbers to a calling list—which would always undoubtedly require some human conduct—was deemed to constitute "human intervention." This is not a situation like *Weisberg*, 2016 WL 3971296, or *Cour v. Life360, Inc.*, No. 16-cv-00805-TEH, 2016 WL 4039279 (N.D. Cal. July 28, 2016), where automated messages were *directly* triggered by an individual's affirmative acts inviting such communications. Simply stated, this Court agrees with other courts which have determined that because a person will always be a but-for cause of any action's machine, "human intervention" for purposes of the TCPA requires more than but-for causation. *Sherman*, 150 F.Supp.3d at 1219. Also in *Johnson v. Yahoo!, Inc.*, No. 14 CV 2028, 2014 WL 7005102, at *5 (N.D. Ill. Dec. 11, 2014), the Court refused to find "human intervention" existed where there

---

1. Facebook also cited to several other cases supporting its "content, context, and similar messages" argument, *see, e.g., Flores v. Adir Int'l, LLC*, No. CV 15-00076-AB, 2015 WL 4340020 (C.D. Cal. July 15, 2015) and *Weisberg v. Stripe, Inc.*, No. 16-cv-00584-JST, 2016 WL 3971296 (N.D. Cal. July 25, 2016), but these cases are distinguishable. Unlike the plaintiffs in these cases, Brickman has alleged, in sufficient detail, how Facebook's software operates as an ATDS.

was some evidence a computer software program could "pull numbers and dial them without a person ordering a specific system message." Here, Brickman has alleged Facebook's dialing system can do exactly that.

### 2. The Court Need Not Address Whether Brickman Granted Facebook Consent at the Motion to Dismiss Stage

While Facebook suggests that Brickman provided prior express consent to receive the text message from it, Brickman has continuously alleged that at all relevant times he indicated in the Notification Settings of his Facebook account that he did *not* consent to receive any text messages from Facebook, including the Birthday Announcement Texts. FAC ¶¶ 2, 36, 79–82, 85. For purposes of this motion, the Court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez*, 487 F.3d at 1249. Accordingly, while the issue may be disputed at a later time, the Court shall accept as true Brickman's allegation that he did not provide consent to receive text messages from Facebook.

### 3. Constitutionality of the TCPA under the First Amendment

Because the Court finds that Brickman's allegations are sufficient to state a claim under the TCPA, Facebook challenges the constitutionality of the TCPA under the First Amendment both as-applied and on its face. Mot. at 17. Because invalidating the TCPA would release Facebook from potential liability and therefore redress its injuries, Facebook has standing to challenge the constitutionality of the TCPA. *McCormack v. Herzog*, 788 F.3d 1017, 1026 (9th Cir. 2015) (in order to challenge a statute, a plaintiff must show a realistic danger of sustaining a direct injury as a result of the statute's enforcement). The

Court shall first address the facial challenge, and then the as-applied challenge.

#### a. Facebook's Facial Challenge

Facebook argues the recent Supreme Court decision in *Reed v. Gilbert*, —— U.S. ——, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015), requires that the TCPA be subject to strict scrutiny. In *Reed*, the Court was analyzing the constitutionality of a town's comprehensive sign code ("Sign Code") that prohibited the display of outdoor signs without a permit, but exempted twenty-three categories of signs including ideological signs, political signs, and temporary directional signs. *Id.* at 2224. The scheme provided different regulations for different categories of signs. For example, ideological signs which were defined as signs "communicating a message or ideas" that did not fit in any other Sign Code category, could be up to twenty square feet and had no placement or time restrictions. *Id.* At the same time, "political signs," which were defined as signs "designed to influence the outcome of an election," could be up to thirty-two square feet and could only be displayed during an election season; and "Temporary Directional signs," defined as "signs directing the public to a church or other 'qualifying event,'" had to be limited to four signs or less, were limited to six square feet, and could not be displayed more than twelve hours before the 'qualifying event' or beyond one hour after the event. *Id.* at 2224–25.

In analyzing the constitutionality of the Sign Code, the Court explained that courts must first determine whether the law is content neutral on its face. *Id.* at 2228. The Court further explained that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech."

*Id.* A government regulation of speech is content-based "if [the] law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. The Court then applied this framework to the Sign Code and found it to be content-based because the restrictions that applied to any given sign "depend[ed] entirely on the communicative content of the sign." *Id.* at 2227. Therefore, the Sign Code was subject to strict scrutiny and, to survive, the town was required to prove the restriction furthered a compelling interest and that it was narrowly tailored to achieve that interest. *Id.* at 2231.

The town claimed that the Sign Code furthered the compelling interests of preserving the Town's aesthetic appeal and promoting traffic safety. *Id.* Yet, even while assuming these were compelling governmental interests, the Court found the Sign Code failed strict scrutiny because it was "hopelessly underinclusive." *Id.* Specifically, the Court found that temporary direction signs were "no greater an eyesore" than ideological or political ones; that the code allowed "unlimited proliferation" of large ideological signs while strictly limiting the number, size, and duration of smaller ones; and that the town offered no reason to believe that directional signs posed a greater threat to traffic safety than ideological or political signs. *Id.* at 2231–32. In light of this underclusiveness, the Court struck the Sign Code down because "a law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damages to that supposedly vital interest prohibited." *Id.* at 2232 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002)).

■ Applying *Reed* to the TCPA, Facebook argues the TCPA is content-based because "it's riddled with exceptions that 'draw[ ] distinctions based on the message a speaker conveys." Mot. at 19:1–3. In particular, Facebook points to three provisions in the TCPA: (1) an exemption applying to any "call made for emergency purposes" (47 U.S.C. § 227(b)(1)(A)); (2) an exemption applying to any call "made solely to collect a debt owed to or guaranteed by the United States (*Id.* at § 227(b)(1)(A)(iii)); and (3) a section empowering the FCC to exempt calls made with an ATDS to a cell phone number if the calls "are not charged to the called party" and are "in the interest of the privacy rights [the TCPA] is intended to protect" (*Id.* at § 227(b)(2)(C)). Mot. at 19–20.

This Court agrees that the first two exceptions are content-based and therefore subject to strict scrutiny. Certainly, each of these exceptions would require a court to examine the content of the message that is conveyed in order to determine if a violation of the TCPA has occurred. Brickman's and the government's arguments to the contrary are not persuasive. First, Brickman argues the TCPA's emergency exemption is content-neutral because whether a call or text falls within the exception depends on the *situation* rather than the content of the message. ECF No. 55 ("Opp'n"), at 11:20–26. But such an interpretation would lead to puzzling results as it would mean that any message sent during a natural disaster or power outage would fall within the emergency exception, regardless of whether the message conveyed safety information, an advertisement, or a joke. This also runs counter to the statutory definition which defines emergency purposes as "calls made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4). Whether a call is "necessary" in a situation affecting the health and safety of consumers would depend on

the content of the call, not just whether an emergency situation exists.

Second, Brickman argues the debt-collection exception is also content-neutral because the "exception is based on the called party's debtor-creditor relationship with the government, not on the content of the message." Opp'n at 12:1–4. This too is unconvincing. The plain language of the exception makes no reference whatsoever to the relationship of the parties. Rather the exception applies to all calls made to collect debt owed or guaranteed by the United States. Brickman's and the government's cited authorities in support of this "relationship" argument are inapposite. In both *Van Bergen v. Minnesota*, 59 F.3d 1541 (8th Cir. 1995), where the court found a Minnesota statute regulating the use of automatic dialing-announcing devices to be content-neutral, and *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303 (7th Cir. 2017), where the court found Indiana's Automated Dialing Machine Statute to be content-neutral, the statutes at issue expressly exempted calls from regulation based on a caller's *relationship* to the recipient, not content.

The third exemption, however, is not a content-based restriction. During oral arguments, Facebook clarified it is not challenging any exceptions made under the FCC's authority, nor is it arguing that the FCC has taken actions that are not consistent with the statute. Instead, Facebook is challenging the FCC's authority to create exemptions to the TCPA because, Facebook argues, such authority "plainly calls for the scrutiny of the content of the message to determine whether it is consistent with the government's views on privacy." ECF No. 64 ("Reply") at 15:17–18. This argument is unavailing. Although the statute empowers the FCC to create exceptions that promote the interest of privacy rights, there are content-neutral ways for the FCC to accomplish this. Indeed, like

the statutes at issue in *Van Bergen*, 59 F.3d at 1545 n. 2, or *Patriotic Veterans*, 845 F.3d at 304–05, the FCC could create exceptions based on a party's relationship. The mere possibility that the FCC could create a content-based exception at some later time does not render this exception to be content-based itself.

In sum, this Court finds the emergency and government-debt exceptions to the TCPA to be content-based. Accordingly, *Reed* requires that the TCPA and the first two exemptions be subject to strict scrutiny. *See Reed*, 135 S.Ct. at 2228.

### i. The TCPA Withstands Strict Scrutiny

█ In order to survive strict scrutiny, "the government [must] prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S.Ct. at 2231. While strict scrutiny is a difficult standard to meet, the Supreme Court has sought to dispel the notion that strict scrutiny is "strict in theory, but fatal in fact." *Williams–Yulee v. Florida Bar*, —— U.S. ——, 135 S.Ct. 1656, 1666, 191 L.Ed.2d 570 (2015) (citation omitted). Here, the Court finds the TCPA survives strict scrutiny.

### 1. The TCPA Serves a Compelling Interest

█ The government devoted several pages supporting its claim that there is a compelling government interest in protecting residential privacy. ECF No. 63 ("U.S. Opp'n") at 17–19. Specifically, the government provided several Congressional records stating, *inter alia*, that the TCPA was enacted "to protect the privacy interests of residential telephone subscribers;" that Congress determined automated telephone calls to be "an invasion to privacy, an impediment to interstate commerce, and a disruption to essential public safety services;" and that Congress determined that

enacting the TCPA was "the only effective means of protecting telephone consumers from this nuisance and privacy invasion." U.S. Opp'n at 18. Facebook assumes for purposes of this motion that promoting privacy is a compelling state interest. Reply at 22:20–21.

The Supreme Court has frequently emphasized that "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey v. Brown*, 447 U.S. 455, 471, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Frisby v. Schultz*, 487 U.S. 474, 484, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (same); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 775, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (same); *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 625, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (same). *See also Carey*, 447 U.S. at 471, 100 S.Ct. 2286 ("Preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value."). Further, the Court has recognized that the interest in residential privacy applies with greater force when individuals seek protection from unwanted speech and has explicitly recognized the Government's ability to protect this freedom:

> One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, [citations], the home is different. . . . [A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.

*Frisby*, 487 U.S. at 484–85, 108 S.Ct. 2495 (citations omitted). In accordance with this legal authority, and because neither party contests the matter, the Court holds the TCPA serves a compelling government interest in promoting residential privacy.

### 2. The TCPA is Narrowly Tailored

 Despite assuming the TCPA serves a compelling interest, Facebook argues the TCPA still cannot survive strict scrutiny because the TCPA is both underinclusive and overinclusive, and because there are less restrictive means of achieving the compelling interest. ECF No. 72 ("FB Supp.") at 1:7–12. The Court addresses each point in turn.

### a. The TCPA is Not Underinclusive

The Supreme Court has recognized that while "underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams–Yulee*, 135 S.Ct. at 1668. After all, "[i]t is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech." *Id.* (emphasis in original). Yet, underinclusiveness of a statute can raise doubts as to whether the government is pursuing an interest it invokes or whether the statute furthers a compelling interest. *Id.* Because "[a] State need not address all aspects of a problem in one fell swoop," the Supreme Court has "upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Williams–Yulee v. Florida Bar*, —— U.S. ——, 135 S.Ct. 1656, 1668, 191 L.Ed.2d 570 (2015).

Facebook argues that TCPA's speech restrictions are "hopelessly underinclusive" under *Reed* because texts about emergencies or government debt are no less intrusive to privacy than other types

of calls. Mot. at 21. However, the Sign Code in *Reed* is distinguishable from this case. First, in *Reed* the Court was addressing a Sign Code that sought to preserve the aesthetics of the town and to promote traffic safety by prohibiting outdoor signs without a permit. Yet the ordinance itself provided twenty-three exceptions. Here, in contrast, the TCPA is not "riddled with exceptions" as it only contains only two exceptions, with the possibility for the FCC to set other exceptions in the future.[2]

Second, unlike the Sign Code in *Reed* which allowed "unlimited proliferation" of one type of sign while strictly limiting a different type of sign, here, neither exception allows for unlimited proliferation of any type of call. Emergency calls by their statutory definition would only be allowed under limited circumstances, for a limited time, and for limited purposes.[3] Moreover, Congress determined that banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consume, is *the only effective means* of protecting telephone consumers from the nuisance and privacy invasion." Telephone Consumer Protection Act of 1991, Pub. L. No. 102–243, § 2(12), 105 Stat. 2394 (1991) (emphasis added). In other words, Congress carefully balanced the interests in the health and safety of consumers with the interests in protecting privacy and determined the emergency call exception was carefully tailored to address both interests.

The government debt exception would likewise be limited by the fact that such calls would only be made to those who owe a debt to the federal government. On a related note, the Supreme Court has recognized that the "United States and its agencies ... are not subject to the TCPA's prohibitions because no statute lifts their immunity." *Campbell–Ewald Co. v. Gomez*, ─ U.S. ─, 136 S.Ct. 663, 672, 193 L.Ed.2d 571 (2016). In other words, the government-debt exception to the TCPA does not present a First Amendment problem because it merely carves out an exception for something the federal government is already entitled to do, and government speech is exempt from First Amendment scrutiny. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467–68, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (The government's own speech is exempt from First Amendment scrutiny); *see also Delano Farms Co. v. Cal. Table Grape Com'n*, 586 F.3d 1219, 1220 (9th Cir. 2009) ("government speech [ ] is immune to challenge under the First Amendment"). And even assuming this newly-added exception[4] were to be invalid, it would not deem the entire TCPA to be unconstitutional because the exception would be severable from the remainder of the statute. *See INS v. Chadha*, 462 U.S. 919, 931–32, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("invalid portions of a statute are to be severed unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not.")

---

**2.** As stated above, Facebook has stated it is not contesting any exemptions created under the FCC's authority to create exemptions under 47 U.S.C. § 227 (b)(2)(C). *See supra* Section III.3.a.

**3.** Notably, in *Reed*, 135 S.Ct. at 2232, the Court recognized that a speech regulation

narrowly tailored to address the challenges of protecting safety "well might survive strict scrutiny."

**4.** The government-debt exception was added to the TCPA in 2015. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114–74, § 301, 129 Stat. 584, 588 (2015)

**1048**

Indeed, the *Reed* court stated that a law cannot justify a restriction on speech in the name of a vital interest, "when it leaves *appreciable* damage to that supposedly vital interest unprohibited." *Reed,* 135 S.Ct. at 2232. Here, the TCPA's exemptions leave negligible damage to the statutes interest in protecting privacy. In sum, the Court finds the exceptions to the TCPA are narrow and not underinclusive to the degree it is "hopeless", nor to the degree that it allows "unlimited proliferation" of privacy intrusions, nor to the degree that it leaves "appreciable damage" to its vital interest in protecting residential privacy.

**b. The TCPA is Not Overinclusive**

Facebook also argues the TCPA is overinclusive because "in purporting to target the ill of unwanted telemarketing it sweeps in speech that facilitates social connections." FB Supp. at 3:16–18. In support of this argument, Facebook cites to congressional findings in support of the TCPA where Congress repeatedly identified telemarketing as a threat to privacy. *See* Telephone Consumer Protection Act § 2. But the TCPA is quite limited in what it prohibits. It only restricts calls made *using an ATDS without the prior express consent* of the recipient. *See* 47 U.S.C. § 227(b)(1)(a). In other words, the TCPA does not restrict individuals from receiving any content they want to receive—speech that would otherwise be prohibited by the TCPA is immediately removed from the purview of the statute once express consent is provided. If individuals want to receive speech from Facebook that facilitates social connections, they are not prohibited from doing so. Accordingly, this Court finds the TCPA is not overinclusive.

**3. Facebook's Suggested Alternatives Are Not Effective**

Lastly, Facebook argues that the TCPA is not narrowly tailored because there are less restrictive alternatives that can regu-

late robocalls. FB Supp. at 4:15–22. The Supreme Court has explained that "[l]ess restrictive alternatives must be *at least as effective* in achieving the legitimate purpose that statute was enacted to serve." *Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 874, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Facebook suggests that two other courts have already recognized less restrictive alternatives for "protecting residential privacy and tranquility from unwanted and intrusive robocalls." Mot. at 22. Specifically, Facebook points to *Cahaly v. Larosa,* 796 F.3d 399, 406 (4th Cir. 2015), where the court found plausible alternatives to include time-of-day limitations, mandatory disclosure of the caller's identity, and do-not-call lists. But in *Cahaly,* the court only found these alternatives to be plausible because the "government [ ] offered no evidence showing that these alternatives would not be effective in achieving its interest." *Id.* Facebook also points to *Gresham v. Rutledge,* 198 F.Supp.3d 965, 971–73 and nn. 17–19 (E.D. Ark. 2016), where the Court recognized plausible less restrictive alternatives to include time-of-day limitations, disconnection requirements, and prohibitions on calls to emergency lines. *Id.* But similar to *Cahaly,* the government in *Gresham* did not contest these three alternatives and "therefore fail[ed] to demonstrate that no less restrictive alternative [was] available." *Id.*

Here, in contrast to the defendants in *Cahaly* and *Gresham,* the Government is contesting the validity of Facebook's proposed alternatives. And this Court agrees that Facebook's proposals would not "be at least as effective" as the TCPA in achieving residential privacy. Time-of-day limitations would not achieve the same privacy objectives because even though such a restriction may designate the span of time in which callers can intrude on an individual's privacy, it would also designate a time for intrusive phone calls. Mandatory disclo-

sure of a caller's identity and disconnection requirements would also not be as effective in achieving residential privacy because these would not prevent the privacy intrusion from the phone call in the first place. Do-not-call lists would also not be a plausible less restrictive alternative because placing the burden on consumers to opt-out of intrusive calls, rather than requiring consumers to opt-in, would obviously not be as effective in achieving residential privacy. Lastly, a prohibition on calls to emergency lines is already incorporated into the TCPA at § 227(b)(1)(a)(i).

Facebook also briefly suggested in its supplemental brief and during oral arguments that the TCPA could be more narrowly tailored by pointing to §§ 227(b)(1)(B) and § 227(b)(1)(C) which Facebook claims exempt noncommercial calls on residential and fax lines from TCPA restrictions. FB Supp. at 5:5–7. But under Facebook's own analysis, such restrictions would also be content-based and subject to strict scrutiny.

In sum, the Court finds Facebook has presented no plausible less restrictive alternative that would at least be as effective in protecting privacy as the TCPA.

### b. Facebook's As–Applied Challenge Fails

Because Facebook's facial challenge fails, so too does its as-applied challenge. The Court need not, and does not, undergo this analysis because even assuming Facebook's text message was not commercial speech, the TCPA withstands strict scrutiny. Accordingly, Facebook's as-applied challenge fails.

## IV. CONCLUSION

For the reasons articulated above, the Court finds Brickman has sufficiently alleged a violation of the TCPA and that the TCPA is constitutional. Accordingly Facebook's Motion to Dismiss is DENIED.

**IT IS SO ORDERED.**