**[J-58-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| IN RE: JUDGE MARK B. COHEN, COURT OF COMMON PLEAS 1ST JUDICIAL DISTRICT PHILADELPHIA COUNTY | : No. 63 EAP 2024<br>:<br>: Appeal from the Order of the Court<br>: of Judicial Discipline entered on<br>: October 7, 2024, at No. 1 JD 2023. |
| APPEAL OF: JUDGE MARK B. COHEN | :<br>: SUBMITTED:  June 17, 2025 |

**OPINION**

**JUSTICE DOUGHERTY**                                        **DECIDED: January 21, 2026**

On October 7, 2024, the Court of Judicial Discipline (the "CJD") suspended then-Judge Mark B. Cohen ("Judge Cohen") for the remainder of his term of service as a result of his partisan political social media posts.  In this appeal as of right under PA. CONST. art. V, §18(c)(1) (a judge "shall have the right to appeal a final adverse order of discipline of the court . . . to the Supreme Court"), Judge Cohen claims his posts were protected speech under the First Amendment to the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution.  This claim raises an open question neither this Court nor the United States Supreme Court has directly addressed: what standard applies when reviewing constitutional challenges to restrictions on a sitting judge's speech? Restrictions on a judicial candidate's speech must satisfy strict scrutiny, as required by the United States Supreme Court's decision in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002).  However, the CJD concluded that, outside the context of an election, governmental restrictions on a sitting judge's speech must clear a lower hurdle: a balancing test.  We agree.  Under the balancing test we adopt today, if a sitting judge

speaks outside of his or her official duties on a matter of public concern, then courts must balance the Commonwealth's interest in protecting the efficiency of the administration of justice, including the independence, integrity, and impartiality of the judiciary, against the judge's interest in making the statement. Here, we hold the Commonwealth's interests in preserving the judiciary's reputation for impartiality outweighed Judge Cohen's interests, as a sitting judge who was not a candidate for judicial office, in publicly advocating for the Democratic Party on Facebook and espousing his partisan political views. Therefore, we affirm the CJD's order suspending him.

## I. Background

Judge Cohen created a personal Facebook page in 2007, while he was a member of the Pennsylvania House of Representatives. He continued to post regularly on Facebook when he joined the bench in 2018 after being elected to the Philadelphia Court of Common Pleas. The "life events" section of his Facebook page identified him as a judge assigned to the Family Division of the Philadelphia Court of Common Pleas and detailed his years of service as a Democratic state legislator and a delegate to the Democratic National Convention. His Facebook page was publicly accessible,[1] with approximately 5,000 Facebook friends and 1,000 followers.

In 2021, the Honorable Margaret T. Murphy, the then-Administrative Judge of the Family Division, received a citizen complaint, through another judge, claiming one of Judge Cohen's Facebook posts was racist. Although the complaint proved to be unfounded, Judge Murphy became concerned about some of Judge Cohen's other Facebook posts. In particular, she flagged: (1) a photo Judge Cohen posted of himself in

---

[1] Facebook has privacy settings that allow users to limit who can see their posts. *See* Facebook, *Basic Privacy Settings & Tools*, https://www.facebook.com/help/3258079375 06242/ (last visited Jan. 15, 2026). Judge Cohen had not used any privacy settings.

his judicial robes behind the bench; and (2) a post boasting he had consistently received an "F" rating from the National Rifle Association as a state legislator.

On September 29, 2021, Judge Murphy and then-President Judge Idee Fox met with Judge Cohen to discuss his Facebook page. Judge Murphy later testified that Judge Cohen was not receptive to their concerns. He insisted his Facebook posts did not violate the Code of Judicial Conduct (the "Code") and rebuffed Judge Murphy's suggestion he report himself to the Judicial Conduct Board (the "JCB") to mitigate any potential violation. However, he agreed to consult an ethics expert: his present counsel, Samuel C. Stretton, Esq. ("Attorney Stretton"). Attorney Stretton later told Judge Murphy that Judge Cohen had removed the photo of himself in his judicial robes as well as the post that triggered the citizen complaint. However, Judge Cohen continued to post regularly on Facebook. When it became apparent that Judge Cohen was not going to self-report, Judge Murphy reported the Facebook posts to the JCB.

A senior JCB investigator reviewed Judge Cohen's Facebook page and saw the photo of Judge Cohen in his judicial robes, despite Attorney Stretton's claim it had been removed.[2] After monitoring the Facebook page and preserving Judge Cohen's posts, the JCB issued a Notice of Full Investigation ("NFI") to Judge Cohen. In response, Judge Cohen admitted responsibility for the posts and claimed they were constitutionally protected free speech. He attended a deposition as part of the investigation in July 2022, but continued to post political content on Facebook, triggering a supplemental NFI from the JCB. Judge Cohen responded to the supplemental NFI and again invoked his constitutional right to free speech.

---

[2] Judge Cohen later said the photo was unknowingly on his Facebook page twice and he simply neglected to delete the duplicate.

Soon after, the JCB filed formal charges against Judge Cohen, alleging he violated Article V, §17(b) of the Pennsylvania Constitution[3] and the following provisions of the Code: Canon 1, Rules 1.1, 1.2, and 1.3; Canon 3, Rules 3.1(C) and 3.7(A); and Canon 4, Rules 4.1(A)(3) and 4.1 (A)(11).[4]

At trial, Judge Murphy and the JCB's senior investigator took the stand, and the JCB introduced copies of more than 60 of Judge Cohen's Facebook posts. For brevity's sake, only a few of the posts are reproduced below as examples:

3.    November 20, 2022, time not listed – "Today is President Joe Biden's Birthday. Many people his age is [sic] impaired. But he has proven to be an excellent President. His experience enables him, and does not wear him down. I look forward to many more achievements!" . . .

5.    November 10, 2022, 6:40 p.m. – "The victories of Governor-Elect Josh Shapiro & Senator-Elect John Fetterman show Gov Tom Wolf should be credited with improving public respect for P[A] state government. Fetterman first LG to win statewide for other post since 1966."

6.    November 9, 2022, 3:22 a.m. – "My friend and former House colleague Josh Shapiro, whose father Dr. Steve Shapiro was a classmate of mine at Central High has been elected P[A]'s Governor. I have no doubt he is up to the job" . . .

8.    November 2, 2022, 4:43 p.m. – "My former legislative colleague Kenyatta Johnson, now completing his 3rd term in the Philly City Council[,] has been found — along with his wife Dawn Chavous — to be not guilty on all charges in federal court today by a jury verdict. A vindication!" . . .

9.    September 22, 2022, (approximate) – "Philly DA Krasner, in switch of tactics, now demands to testify before P[A] House Committee seeking evidence of wrongdoing to begin impeachment proceedings. Good move!" . . .

---

[3] Article V, §17(b) provides, in relevant part, that "judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court." PA. CONST. art. V, §17(b).

[4] We reproduce the substance of these Code provisions *infra*.

11.     September 20, 2022 (approximate), time not listed – "Babette Josephs was the most public and persistent fighter for women's rights in Post-*Roe* Pennsylvania.  I would like to see her birthday, August 4, be publicly celebrated as Babette Josephs Day." . . .

15.     August 4, 2022, 2:51 a.m. – "As a young man, I remember journalistic anger at Roger Maris & Eugene McCarthy for becoming national heroes with heroic achievements.  John Nichols' hit job against Liz Cheyney [sic] in [ ] The Nation is of the same sad kind."  In the midst of the exchange of posts that ensued from this post, [Judge Cohen] posted the following: "I believe from personal experience that people can and do change their views over time.  As a judge, I am not permitted to endorse or otherwise back any candidate for anything.  But I strongly disbelieve that good works by anyone should subject them to harsh criticism while those who do far fewer good things remain totally ignored." . . .

22.     August 5, 2022, 9:19 p.m. – "Inquirer: Unemployment falls to 3.5%, tying for the lowest since 1969.  More people are employed in [the U.S.] than ever before, showing a very strong economy, and strengthening Social Security System.  It's time for critics to re-evaluate this Administration."

23.     August 3, 2022, 9:39 p.m. – "Senator Amy Klobuchar predicts Sen. Kirsten [sic] Sinema will be on board with Inflation Reduction Act next week, & it will pass Senate, lowering annual deficit, fighting climate change, & reducing prescription costs.  A victory for fiscal responsibility."

24.     August 3, 2022, 1:13 a.m. – "By a 59% to 41% vote, Kansas voters rejected a constitutional amendment that would have allowed the legislature to ban abortion.  High turnout took place on 100-degree day, and sent a message that even conservative states are not on board with US Supreme Court reversal of *Roe v. Wade*." . . .

27.     July 30, 2022, 6:06 p.m. – "Despite the support of [John] Baer, Gov. Tom Wolf, and many others, the legislature still has not raised the minimum wage above the current $7.25 level.  When P[A] raised the minimum wage to $7.15 (10 cents less than the federal level which ultimately followed), under my leadership in 2006, I immediately advocated that it should soon go up to $8.00.  Even after 16 years, and a $15.00 an hour minimum wage in NJ, NY, California and other states, the minimum wage in P[A] and the USA has remained stagnant.["] . . .

45.     July 28, 2022, 6:44 p.m. – "A very good point!"  The posting includes a reposting of a photograph of a cartoon with Lisa Simpson making a speech, with a projection screen behind her.  The screen bears the following text: "Trickle-down economics has never gotten Billionaires to spread the wealth.  That's what unions are for." . . .

46.     August 30, 2022, 1:14 p.m. – "Still another take on the student loan debt repayment plan."  The posting includes a reposting of a cartoon of a man at a trolley track switch and five people tied to the tracks on one of the track branches where the[ ] trolley is headed.  Behind the trolley are the bodies of a number of people who the trolley had already run over.  The man at the train track switch states[,] "But if I divert the trolley now[,] that would be unfair to all the people it's already killed." . . .

51.     August 25, 2022, 1:34 p.m. – "I agree with this!"  The posting also includes a reposting of a photograph with the following text on it: "I worked hard to pay off my student loans, others should have too!  I swam across that river, how dare they build a bridge!" . . .

55.     November 6, 2021, 3:11 p.m. – "One year ago, our country voted for massive change.  We are starting to get it, but more can be done." . . .

60.     November 18, 2021, 11:33 p.m. – "Good night, Kevin McCarthy.  Good night moon.  No matter how long Kevin talks, we'll have House passage of Build Back Better soon."

*In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 10-32, *quoting* JCB Ex. 8.[5]

Over Judge Cohen's objection, the JCB also called Dr. Allison Merrill, a professor specializing in American politics and political communication, who opined Judge Cohen's Facebook posts constituted partisan political activity.  She explained an "overwhelming number" of the posts showed Judge Cohen's support for "policies or political figures

---

[5] Comments in response to Judge Cohen's posts also raised concerns.  For instance, one of Judge Cohen's posts led commenters to accuse a Pennsylvania attorney of "professional misconduct and criminal conduct."  *In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 20-21, *quoting* JCB Ex. 8, ¶31.  Although Judge Cohen eventually attempted to extricate himself from the conversation, *see id.* at 21 ("as a judge, I am limited in the degree to which I can comment on political actors, attorneys, or judges in court proceedings"), *quoting* JCB Ex. 8, ¶31, he did not delete his post or the inflammatory comments.  Judge Cohen later claimed he did not need to delete the post because the attorney was "capable of defending himself."  N.T. Trial, 7/24/23, at 301.

associated with the ideological left or the Democratic Party[,]" while other posts criticized policies of traditionally conservative states. N.T. Trial, 7/24/23, at 130.

Judge Cohen presented several character witnesses by stipulation. He then testified on his own behalf and denied posting anything partisan. He acknowledged an original purpose of his Facebook page, as state representative, was "pushing the Democratic Party[,]" but claimed he was now just "trying to engage people in discussion" on topics of public importance. *Id.* at 244-45, 249.[6] In his view, he was not "engaging in any political activity"; he was merely commenting on "issues which were being discussed widely in the media at the time." *Id.* at 256. He said getting responses to his posts "made [him] feel good" and ameliorated the isolation he had felt since leaving the legislature. *Id.* at 250, 291. He also downplayed the impact of his posts, suggesting his Facebook page did not have "any significance other than a communication to a small group of people, only a fraction of whom pay any attention to any posts." *Id.* at 307.

On May 3, 2024, the CJD issued an opinion concluding Judge Cohen violated Article V, §17(b) of the Pennsylvania Constitution and all seven charged provisions of the Code. Specifically, the CJD determined Judge Cohen "infused his Facebook page and postings with the prestige of his office" by identifying himself on Facebook as a judge and then used his page to express his political views. *In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 42. In doing so, Judge Cohen advanced the interests of the Democratic Party, the partisan political figures he touted (like President Biden and Governor Shapiro), and the liberal causes promoted in his posts, in violation of Canon 4, Rule 4.1(A)(11) (prohibiting judges from "engag[ing] in any political activity on behalf of a political organization or

---

[6] Judge Cohen "never deleted any posts [he] made as a legislator." N.T. Trial, 7/24/23, at 302. However, since the JCB did not charge Judge Cohen for misconduct based on any of his pre-2018 Facebook posts, we do not opine on whether persons elected to the bench have a duty to scrub their pre-existing social media accounts.

candidate for public office except on behalf of measures to improve the law, the legal system, or the administration of justice"). The CJD deemed irrelevant Judge Cohen's subjective perception of the posts or belief in his own impartiality. As the CJD explained, the Code seeks to avoid not just partiality, but also the appearance of partiality or impropriety. The CJD concluded Judge Cohen's posts had created an appearance of partiality and "call[ed] into question the independence of the judiciary[,]" *In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 45, in violation of Canon 1, Rule 1.2 ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."), and Canon 3, Rule 3.1(C) (precluding judges from participating in extrajudicial "activities that would reasonably appear to undermine the judge's independence, integrity, or impartiality").

The CJD also concluded Judge Cohen detracted from the dignity of his office by touting his own partisan political activity as a state legislator, *see id.* at 16 ("I spearheaded Pennsylvania's pioneering 2015 law against the Boycott, Divestment and Sanctions movement seeking [to] deprive Israel of foreign trade on a state-by-state basis"), *quoting* JCB Ex. 8, ¶21; *id.* at 19 ("under my leadership in 2006, I immediately advocated that [the minimum wage] should soon go up to $8.00"), *quoting* JCB Ex. 8, ¶27, in violation of Canon 3, Rule 3.7(A) ("Judges may write, lecture, teach, and speak on non-legal subjects . . . if such avocational activities do not detract from the dignity of their office or interfere with the performance of their judicial duties.").

The CJD rejected any argument Judge Cohen received no benefit from his posts. As the CJD noted, Judge Cohen "admitted relishing being a commentator on Facebook and presenting his views to his Facebook friends and followers to generate discussion[.]" *Id.* at 51. Therefore, the CJD concluded Judge Cohen "abuse[d] the prestige of his office

to advance his own personal and political interests and the personal and political interests of others[,]" *id.* at 44, violating Canon 1, Rule 1.3 ("A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so.").

Judge Cohen's post regarding then-United States Representative Liz Cheney drew particular censure from the CJD. Since Cheney was running for re-election at the time Judge Cohen "posted his criticism of her detractors[,]" *id.* at 58, the CJD concluded Judge Cohen effectively endorsed Cheney, in violation of Canon 4, Rule 4.1(A)(3) (prohibiting judges from "publicly endors[ing] or publicly oppos[ing] a candidate for any public office"). The CJD was not persuaded by Judge Cohen's efforts in the comments section of his Facebook post to avoid an endorsement. In the CJD's view, Judge Cohen "attempted to have it both ways by endorsing her and disclaiming the endorsement at the same time[,]" but "the point remain[ed] the same — he 'express[ed] support or approval of' then-Representative Cheney, who was then a candidate." *Id.* at 58-59, *quoting* Canon 4, Rule 4.1(A)(3).[7]

The CJD rejected Judge Cohen's argument that the Code precluded him from commenting only on issues he might encounter in Family Court. As the CJD explained, Judge Cohen sat on a court of general jurisdiction and could easily be assigned to another division of the Court of Common Pleas. "More importantly," the CJD elaborated, as a

---

[7] The final two charges against Judge Cohen were "automatic, derivative violations of the previously discussed violations of the Code[.]" *In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 62, *citing* PA. CONST. art. V, §17(b) ("judges shall not . . . violate any canon of legal or judicial ethics prescribed by the Supreme Court"), and Canon 1, Rule 1.1 ("A judge shall comply with the law, including the Code of Judicial Conduct.").

jurist, he was a "representative of all judges in Pennsylvania" and therefore had a duty to avoid creating a perception of partiality, regardless of his present assignment. *Id.* at 47.[8]

The CJD also addressed Judge Cohen's First Amendment defense. The CJD first acknowledged judges are free to have social media accounts, make speeches, and write articles. Indeed, the CJD acknowledged "[s]ocial media can be positive for a judge to use professionally" and is almost a necessity given that "about half of Pennsylvania's judiciary has contested elections every six years[.]" *Id.* at 63-64. In the CJD's view, it is the "content and context of the action which determines whether" a judge's social media use becomes an ethical violation. *Id.* at 63.

Before reaching that question, however, the CJD had to decide what standard governed Judge Cohen's First Amendment claim. The CJD noted content-based restrictions on speech are typically evaluated under a strict scrutiny test, requiring proof the restriction: (1) addresses a compelling state interest; and (2) is narrowly tailored to effectuate that interest. However, in the context of public employees, courts apply a more deferential balancing test — *i.e.*, the *Pickering*[9] test. Under this balancing test, "[i]f the

---

[8] Judge Cohen also cited a comment to a rule permitting candidates for judicial office to express political views. *See* Canon 4, Rule 4.1, cmt. 9 ("The making of a pledge, promise, or commitment is not dependent upon, or limited to, the use of any specific words or phrases; instead, the totality of the statement must be examined to determine whether the candidate for judicial office has specifically undertaken to reach a particular result. Pledges, promises, or commitments must be contrasted with statements or announcements of personal views on legal, political, or other issues, which are not prohibited. When making such statements, a judge should acknowledge the overarching judicial obligation to apply and uphold the law, without regard to his or her personal views."). However, as the CJD pointed out, Judge Cohen was "not a candidate when he made the Facebook posts in question." *In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 57. Moreover, in the CJD's view, "Judge Cohen's conduct of being a 'cheerleader' for partisan political figures who occupy offices in the legislative and executive branches of government would be prohibited by the Code, even if he was a candidate." *Id.* (emphasis omitted).

[9] *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

speech involves a matter of public concern and was not part of the individual's official duties, then the deciding court weighs the interests of the employee, as a citizen, in commenting upon matters of public concern, and the state, as the employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 76. The CJD acknowledged Pennsylvania courts have never directly addressed which standard applies to judicial speech, and other courts reviewing the issue have taken a "somewhat uneven approach." *Id.* at 66. After reviewing some of the case law, the CJD concluded it previously "applie[d] a lesser standard of scrutiny in line with *Pickering* and *Gentile* [*v. State Bar of Nevada*, 501 U.S. 1030 (1991)] without ever having expressly been presented with the issue." *Id.* at 74. Specifically, in *In re Eakin*, 150 A.3d 1042 (Pa. CJD 2016), the CJD held former Pennsylvania Supreme Court Justice J. Michael Eakin violated the Code by sending emails that, "for the average citizen, would likely constitute First Amendment protected communications." *In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 74. But since Justice Eakin was not commenting on matters of public concern or acting within his official duties, the CJD concluded *Pickering* gave "the government, as employer, . . . a right to sanction [him] for the content of the emails regardless of the First Amendment." *Id.*

Using *In re Eakin* as a guide, the CJD ultimately chose to apply a balancing test in Judge Cohen's case. The CJD first noted his posts "commented on matters of public concern and . . . generally did not directly involve his official duties[.]" *Id.* at 76. The CJD then concluded Judge Cohen's interest in freely speaking on Facebook did not outweigh the Commonwealth's interests under these circumstances. Because "[h]is Facebook posts reflect a large degree of sympathy, support, and ideological affinity with members of the left[,]" the CJD believed "a member of the public might reasonably conclude that Judge Cohen would be swayed in his judicial conduct by his political views." *Id.* at 77.

Nevertheless, the CJD concluded that, even under a strict scrutiny standard, the charges against Judge Cohen would survive because the Code is narrowly tailored to prevent the perception of judicial partiality, "while, at the same time, allowing a judge the meaningful opportunity to participate in the election process to advance their own electoral prospects . . . or to take limited political action to advance the law, the legal system, or the administration of justice." *Id.* at 75-76.[10]

On September 25, 2024, Judge Cohen appeared before the CJD for a sanctions hearing. At the hearing, two attorneys testified to Judge Cohen's reputation for fairness, and said he never expressed political views from the bench. The JCB also introduced new Facebook posts Judge Cohen had made since his trial, including some commenting on his disciplinary case. For instance, on September 2, 2024, Judge Cohen posted:

> P[A] Court of Judicial Discipline to weigh censuring me for "political[,"] "Democratic" or "left wing" Facebook posts — on September 25th 9:30 a.m. . . . More letters in support of me needed ASAP. See below for information.

---

[10] The CJD also rejected Judge Cohen's claim he had no warning his Facebook posts violated the Code. Although the Code does not specifically mention Facebook, the CJD reasoned Judge Cohen was "certainly on notice that he could not engage in impermissible political activity . . . on behalf of candidates or political organizations[,]" and "could not lend the prestige of his office to further his own personal interests or those of others[.]" *In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 81. "The fact that his problematic speech took place online versus in person or the media is not relevant[,]" in the CJD's view. *Id.* Indeed, the CJD pointed out it had "resolved several internet or electronic-speech cases" before Judge Cohen was charged, "which constructively put the entirety of the Commonwealth's judges on notice that their speech in those domains could result in violations of the Code." *Id.*

In his brief before this Court, Judge Cohen passingly argues "there was a violation of due process under the Fourteenth Amendment of the United States Constitution since the Code of Conduct did not give adequate notice" his conduct was prohibited. Appellant's Brief at 49. However, we conclude this claim is "waived due to appellant's failure to adequately develop it with argument, applicable authority, and pertinent analysis." *Commonwealth v. Armolt*, 294 A.3d 364, 380 (Pa. 2023) (internal quotation marks and citation omitted).

N.T. Sanctions Hearing, 9/25/24, at 18. When someone on Facebook asked who was behind the complaint, Judge Cohen responded: "Conservative people who want judges to be scared of their own shadow and completely silent on issues of societal improvements and social justice." *Id.* The CJD later noted "no other case in [its] history . . . involved such defiance post decision." Sanctions Order, 10/7/24, at 3.

On October 7, 2024, the CJD issued an order immediately suspending Judge Cohen without pay for the remainder of his term of service, ending on December 31, 2024 (the date of his mandatory retirement under 42 Pa.C.S. §3351 ("Judges and magisterial district judges shall be retired upon attaining the age of 75 years.")). Judge Cohen appealed directly to this Court. *See In re Lokuta*, 11 A.3d 427, 434 (Pa. 2011) ("A judicial officer has the right to appeal a final adverse order of the Court of Judicial Discipline to this Court."), *citing* PA. CONST. art. V, §18(c)(2). On June 17, 2025, we denied Judge Cohen's request for oral argument and submitted this matter on the briefs. *See* 210 Pa. Code §101.6 (on direct appeal from the CJD, the "[r]eviewing [c]ourt may hear oral argument").

## II. Discussion

"This Court's review of a decision by the CJD is governed by our Constitution[.]" *In re Merlo*, 58 A.3d 1, 8 (Pa. 2012). We "review the record of the proceedings of the [CJD] as follows: on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and, as to sanctions, the scope of review is whether the sanctions imposed were lawful." PA. CONST. art. V, §18(c)(2). We "may revise or reject an order of the [CJD] upon a determination that the order did not sustain this standard of review; otherwise, [we] shall affirm the order the [CJD]." *Id.*

## A. Arguments

Judge Cohen claims the CJD erred in finding his Facebook posts violated the Code and the Pennsylvania Constitution.[11] He argues his Facebook posts were protected speech under the First Amendment to the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution.[12]

---

[11] Judge Cohen also claims the CJD violated Pa.R.E. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson; (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and (c) the expert's methodology is generally accepted in the relevant field."), by allowing Dr. Merrill to testify as an expert witness. He argues Dr. Merrill's testimony was unnecessary because the CJD was qualified to determine whether the Facebook posts constituted partisan political speech. In response, the JCB argues Judge Cohen waived this claim. According to the JCB, he "stipulated to Dr. Merrill's qualifications and all but one sentence of her report[,]" which was redacted. Appellee's Brief at 72. In any event, the JCB claims it was appropriate for the CJD to permit Dr. Merrill's testimony. *See id.* at 73-74 ("proving the subtleties of some of the messaging involved in Judge Cohen's Facebook posts, such as their physical appearance, as well as their potential effect, in the [JCB]'s view, called for expert testimony in this case") (emphasis omitted).

We disagree with the JCB's waiver argument. Although Judge Cohen did stipulate in part to Dr. Merrill's qualifications and report, *see* N.T. Trial, 7/24/23, at 96-97, 104-10, he did so only after the CJD overruled his objection that Dr. Merrill's testimony was unnecessary, *see* Order Denying Mot. to Bar Testimony, 7/1/23, at 1 (unpaginated) ("Counsel for Judge Cohen argues . . . that [Dr. Merrill's] testimony is unnecessary since the [c]ourt can decide whether Judge Cohen's Facebook postings are political or not without any expert testimony."). Therefore, Judge Cohen preserved his claim below. Nevertheless, we hold the claim is waived on appeal for lack of development. In his single-page argument, Judge Cohen fails to cite a single case supporting his position or offer any meaningful analysis. His bald assertion that the CJD was "perfectly in a position to decide whether this was political speech" is, by itself, inadequate to warrant review. Appellant's Brief at 85; *see Armolt*, 294 A.3d at 379 ("This type of mere issue spotting without sufficient analysis or legal support precludes appellate review."). Accordingly, we will not address the merits of this waived claim.

[12] Judge Cohen does not argue Article I, Section 7 provides additional protections beyond what the First Amendment guarantees in this particular context. On the contrary, he treats the two constitutions as coterminous, and he recognizes other courts have done the
(continued…)

Of course, that argument raises the question of what standard applies. Judge Cohen claims the CJD should have applied strict scrutiny because the restrictions on his Facebook posts are content based. However, he acknowledges this is a "novel legal issue unsettled" in this context under both Pennsylvania and federal law. Appellant's Brief at 61. Accordingly, he cites two related cases as analogies: *White*, *supra*, and *Stretton v. Disciplinary Board of the Supreme Court of Pennsylvania*, 944 F.2d 137 (3d Cir. 1991). We will discuss these cases further below. For now, we note the courts in both cases applied strict scrutiny to provisions precluding candidates for judicial office from announcing their views on "disputed legal or political issues" (*i.e.*, the "announce clause"). *White*, 536 U.S. at 768 (citation omitted); *Stretton*, 944 F.2d at 141. In Judge Cohen's view, both his case and *White* "involve the attempted suppression of personal opinion by a judge that does not reflect on pending cases or undermine the integrity of the Court." Appellant's Brief at 63. As such, he argues strict scrutiny should apply here. *See id.* at 67 ("strict scrutiny is warranted for extra judicial speech of a sitting judge, as well as for a judicial candidate").

Regardless, Judge Cohen claims under either standard, the charges against him should be overturned. He acknowledges the JCB has an interest in maintaining judicial impartiality and integrity but claims his Facebook posts did not call either into question. On his telling, he posted only on issues of public importance and never endorsed candidates or commented on pending cases. Unlike the emails at issue in *In re Eakin*,

---

same. *See* Appellant's Brief at 59 (noting the case law does "not suggest the broader protections of Article I, Section 7 of the Pennsylvania Constitution ha[ve] been expanded . . . [to] the issue of extra judicial speech of a sitting judge"). Consequently, we limit our analysis to the First Amendment. *See Commonwealth v. Bishop*, 217 A.3d 833, 841 (Pa. 2019) (this Court "treats parallel federal and state constitutional provisions as coterminous where the appellant has done nothing to distinguish between them"); *see id.* at 840 ("to raise claims for departure from federal constitutional jurisprudence on independent state grounds . . . some analysis explaining the grounds for departure is required").

*supra*, Judge Cohen asserts his Facebook posts "were discussions on serious issues[,]" with nothing "insensitive" or "inappropriate." *Id.* at 53.[13] He claims there would be "little, if nothing, left to the First Amendment right of a sitting judge if he or she could not speak out" on issues of public importance. *Id.* at 61. Indeed, in his view, the comments to the Code encourage judges to express their personal opinions and participate in extrajudicial activities. *See* Pa. Code of Judicial Conduct, Canon 3, Rule 3.1, cmt. 1 ("To the extent that time permits, and judicial independence and impartiality are not compromised, judges are encouraged to engage in appropriate extrajudicial activities.").

In response, the JCB claims the evidence was sufficient to prove Judge Cohen violated the Code and the Constitution. After walking through each charge and explaining why it believes Judge Cohen's Facebook posts were improper, the JCB disputes Judge Cohen's claim that the Code improperly interferes with his constitutional right to free speech. The JCB first argues the applicable standard ultimately makes no difference here, because the CJD applied both strict scrutiny and the balancing test and concluded the charged Code provisions survived under both standards as applied to Judge Cohen's conduct. To illustrate this point, the JCB compares this case to *In re Raab*, 793 N.E.2d

---

[13] Judge Cohen compares his Facebook posts to a book written by United States Circuit Court Judge Amul Thapar on Supreme Court Justice Clarence Thomas and originalism. He claims Judge Thapar participated in interviews on Fox News regarding his book and received book endorsements from "conservative and political people." Appellant's Brief at 74. The JCB responds that Judge Cohen waived this argument by raising it for the first time on appeal. The JCB also claims the book is a poor comparison. As the JCB sees it, "the writing of such a treatise clearly falls within a judge's larger grant of authority to write and teach about legal subjects," and "share their legal expertise with the public[,]" Appellee's Brief at 51, *citing* Pa. Code of Judicial Conduct, Canon 3, Rule 3.1, cmt. 1 ("Judges are uniquely qualified to engage in extrajudicial activities that concern the law, the legal system, and the administration of justice, such as by speaking, writing, teaching, or participating in scholarly research projects."), whereas Judge Cohen commented on "partisan political subjects and actors" to receive "his Facebook friends and followers[1] . . . adulation[.]" *Id.* To the extent the comparison is even remotely apt, we reject it outright based on the simple fact that Judge Thapar, as a jurist on the Sixth Circuit, is not subject to this Commonwealth's Code of Judicial Conduct.

1287 (N.Y. 2003), where the New York Court of Appeals — New York's court of last resort — upheld restrictions on judicial speech even under a strict scrutiny analysis. Unlike the broad "announce clause" at issue in *White*, New York's "rules distinguish between conduct integral to a judicial candidate's own campaign and activity in support of other candidates or party objectives." *Raab*, 793 N.E.2d at 1292. By way of example, judicial candidates can make speeches in support of their own campaigns but cannot endorse other candidates or make speeches on behalf of a political party. *See id.* Therefore, the *Raab* Court concluded New York's rules were narrowly tailored to protect judicial candidates' First Amendment rights and protect the integrity of the judiciary. Applying that logic here, the JCB believes Judge Cohen's claim should be rejected even if we do adopt a strict scrutiny test. *See* Appellee's Brief at 70 (Pennsylvania's "Code does not work a 'complete' ban on political speech by judges. Under the Code, judges retain significant ability to engage in extrajudicial expressive conduct and in political conduct to further their own political prospects as well as to advance the law and the legal system[.]").

Still, the JCB urges us to adopt a balancing test. Although "judges are not 'employees' of the government" in the strictest sense, the JCB believes "their position is analogous to a higher-level government employee who works with the public and whose fitness to serve in that position is measured by the sensitivity and accountability of their specific position in government." *Id.* at 66. The JCB reasons judges, like government employees, "voluntarily assume the restrictions on their speech in the Code in exchange for the benefits of office[.]" *Id.* (emphasis omitted). Moreover, the JCB reiterates the CJD has previously applied a "lesser standard of scrutiny similar to *Pickering*" and argues this Court's adoption of this test would recognize the government's legitimate interest in ensuring the impartiality and integrity of the judiciary. *Id.* at 61-62, *citing In re Eakin*, *supra*. The JCB also claims "the right to trial in a fair, open, and impartial court is of the

same constitutional magnitude as [Judge Cohen's] right to free expression under both the federal and state constitutions." *Id.* at 68.

Applying *Pickering*, the JCB argues "the First Amendment does not shield Judge Cohen's posts from sanction because the posts reflect a large degree of sympathy, support, and ideological affinity with members of the Democratic Party" and "tout his own past partisan political conduct." *Id.* at 69. Echoing the CJD's opinion, the JCB argues a "member of the public would reasonably conclude that Judge Cohen's independence, integrity, and impartiality could be swayed in his judicial conduct, which undermines the enterprise of the judiciary" — a problem that outweighs Judge Cohen's interest in political speech. *Id.* at 69-70.

## B. Analysis

Unquestionably, judges do not give up all First Amendment rights upon assuming the bench. *See Matter of Williams*, 887 S.E.2d 231, 247 (W. Va. 2023) ("Judges do not lose all First Amendment protections when taking the robe."); *In re Kendall*, 712 F.3d 814, 824 (3d Cir. 2013) ("federal and state courts have repeatedly held that a 'judge does not check his First Amendment rights at the courthouse door, to be reclaimed at the expiration of his judicial tenure'"), *quoting In re Judicial* Misconduct, 632 F.3d 1289, 1289 (9th Cir. Jud. Counc. 2011). However, judges do accept certain restrictions on their right to speak. "No one is compelled to serve as a judge, but once an individual offers himself or herself for service, that individual accepts the calling with full knowledge of certain limitations upon speech and actions in order to serve the greater good." *Miss. Comm'n on Judicial Performance v. Osborne*, 11 So.3d 107, 114 (Miss. 2009); *see also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.").

In this appeal, we are tasked with deciding what standard applies when reviewing constitutional challenges to governmental restrictions imposed on a sitting judge's speech.[14] Judge Cohen asks us to apply strict scrutiny; the JCB advocates for a balancing test. We begin by more closely examining each proposed standard.

"To determine whether a law that regulates speech violates the First Amendment, [courts] consider both the nature of the burden imposed by the law and the nature of the speech at issue." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 470-71 (2025). "Restrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (citation omitted). Generally, a restriction is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *TikTok Inc. v. Garland*, 604 U.S. 56, 70 (2025), *quoting Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Speech restrictions based on the identity of the speaker often fall within this category. *See id.* at 72 ("speech restrictions based on the identity of the speaker are all too often simply a means to control content") (brackets omitted)*, quoting Citizens United v. FEC*, 558 U.S. 310, 340 (2010). However, "[strict] scrutiny is unwarranted when the differential treatment is justified by some special characteristic of the particular speaker

---

[14] The Pennsylvania Constitution explicitly vests this Court with "the supreme judicial power of the Commonwealth[.]" PA. CONST. art. V, §2(a). Additionally, the state charter grants this Court exclusive "supervisory and administrative authority over all the courts" and judicial officers within the Commonwealth, *id.* at §10(a), and "the power to prescribe general rules governing practice, procedure and the conduct of all courts," including "the administration of all courts and supervision of all officers of the Judicial Branch," *id.* at §10(c). One way in which this Court has exercised this supervisory power is through the "adoption of the Code of Judicial Conduct and the Rules Governing Standards of Conduct of Magisterial District Judges[,]" *In re Bruno*, 101 A.3d 635, 684 n.27 (Pa. 2014), which serve as the exclusive means of regulating the conduct of judicial officers within the Commonwealth. Because this Court alone is "reposed [with] the supreme judicial power of the Commonwealth," PA. CONST. art. V, §2(a), including promulgation of the Code provisions challenged in this appeal, any references throughout this opinion to the "State," the "Commonwealth," or the "government," should be understood in this context.

being regulated[.]" *Id.* at 72-73, *quoting Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 660-61 (1994) (cleaned up).

*Pickering* offers one example. In that case, a teacher sued the Board of Education for firing him based on a letter he sent to a newspaper criticizing the Board's past proposals to raise revenue. On appeal, the United States Supreme Court acknowledged public employees retain their First Amendment right to speak on matters of public concern. Yet, the Court also acknowledged "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. Accordingly, courts must seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* The High Court implied this balance may change depending on the nature of the job, with "the need for confidentiality [being] so great" in certain positions that "even completely correct public statements might furnish a permissible ground for dismissal." *Id.* at 570 n.3.[15]

Courts have since interpreted *Pickering* as creating a two-prong balancing test.[16] First, a reviewing court must decide whether the employee's speech addressed "a matter

---

[15] Ultimately, the *Pickering* Court ruled against the State on the facts, concluding "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." 391 U.S. at 572; *see id.* at 574 ("we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment") (footnote omitted).

[16] The *Pickering* test assumes the employee is speaking outside of his or her official duties. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the (continued…)

of public concern." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987) (citation omitted). If the answer is no, then the State "enjoy[s] wide latitude in managing [its] offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick v. Myers*, 461 U.S. 138, 146 (1983); *see id.* at 147 ("when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, [courts are] not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior"). But, if the answer is yes, meaning the employee's speech does address a matter of public concern, then courts must "balance [the employee's] interest in making [the] statement against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rankin*, 483 U.S. at 388, *quoting Pickering*, 391 U.S. at 568.

For instance, in *U.S. Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548 (1973), the United States Supreme Court applied the balancing test to a provision of the Hatch Act that prohibited "federal employees [from] taking 'an active part in political management or in political campaigns[.]'" *Id.* at 550, *quoting* 5 U.S.C. §7324(a)(2). Although the Court acknowledged Congress was "free to strike a different balance than it ha[d]," the Court "th[ought] the balance it ha[d] so far struck [wa]s sustainable by the obviously important interests sought to be served by the limitations on partisan political activities[.]" *Id.* at 564. The High Court reasoned "it is not only important that the Government and its employees in fact avoid practicing political justice, but it is

---

Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Since posting on a personal social media account clearly falls outside a judge's official duties, *Garcetti* does not apply here, and the parties do not argue otherwise.

also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Id.* at 565*.*

A decade later, in *Connick*, the High Court applied the balancing test to an assistant district attorney who had circulated a questionnaire inquiring if her coworkers "ever feel pressured to work in political campaigns on behalf of office supported candidates." 461 U.S at 149. Since the "questionnaire touched upon matters of public concern in only a most limited sense[,]" the Court concluded the balance weighed in favor of the government. *Id.* at 154; *see id.* ("it would indeed be a Pyrrhic victory for the great principles of free expression if the Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here").

Judges, however, are not "employees" of the government in the traditional sense. In Pennsylvania and many other states, judges are constitutionally elected officials. *See* PA. CONST. art. V, §13. Judicial candidates, like candidates for other elected offices, must be afforded the right to communicate their qualifications and views to voters while on the campaign trail to differentiate themselves from their opposing candidates.

Some courts have held this makes an elected judge more like a politician than a government employee. *See Jenevein v. Willing*, 493 F.3d 551, 557-58 (5th Cir. 2007) (declining to "draw directly upon the *Pickering-Garcetti* line of cases" when reviewing restrictions on a sitting judge's speech to his constituency; "as an elected holder of state office, his relationship with his employer differs from that of an ordinary state employee"). Echoing this argument, Judge Cohen urges us to disregard *Pickering* and instead extend the High Court's decision in *White*. In *White*, the Court addressed a provision of Minnesota's "announce clause," which precluded candidates for judicial office from announcing their views on "disputed legal or political issues." *White*, 536 U.S. at 768

(citation omitted). Since "the announce clause both prohibit[ed] speech on the basis of its content and burden[ed] a category of speech that is 'at the core of our First Amendment freedoms' — speech about the qualifications of candidates for public office" — the Supreme Court applied strict scrutiny. *Id.* at 774.[17] "Under the strict-scrutiny test, respondents have the burden to prove [the speech restriction] is (1) narrowly tailored, to serve (2) a compelling state interest." *Id.* at 774-75. A restriction is narrowly tailored only if "it does not unnecessarily circumscribe protected expression." *Id.* at 775 (cleaned up).

The announce clause failed that test. Specifically, the High Court held the announce clause was not narrowly tailored to serve Minnesota's interest in judicial impartiality. The Court concluded any interest the State had in ensuring judicial candidates have no preconceptions about the law was not a compelling one. *See id.* at 778 ("Proof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias."), *quoting Laird v. Tatum*, 409 U.S. 824, 835 (1972). The Court also noted the announce clause was, in practice, illogical. For example, it permitted judges to freely express an opinion on the constitutionality of same-sex marriage before declaring their candidacy and after their election. It was only during the campaign — the time their views are most relevant — that the announce clause restricted their speech. *See id.* at 779.[18]

---

[17] The parties in *White* did not dispute that strict scrutiny applied, so the High Court discussed its choice to apply that standard only summarily. *See id.* at 774. The Court formally adopted the strict scrutiny test twelve years later, in *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015) ("[W]e hold today what we assumed in *White*: A State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest.").

[18] A decade earlier, the Third Circuit applied strict scrutiny to a materially identical announce clause. *See Stretton*, 944 F.2d at 138, 141 (applying strict scrutiny to a provision of Pennsylvania's Code prohibiting "candidates for a judicial office in an (continued…)

The problem for Judge Cohen, however, is that he was not a candidate for any office at the time he made his Facebook posts. *White* did not address speech restrictions on sitting judges; it spoke only to the special context of elections:

> This case does not present the question whether a State may restrict the speech of judges because they are judges — for example, as part of a code of judicial conduct; the law at issue here regulates judges only when and because they are candidates. Whether the rationale of *Pickering* . . . could be extended to allow a general speech restriction on sitting judges — regardless of whether they are campaigning — in order to promote the efficient administration of justice, is not an issue raised here.

*White*, 536 U.S. at 796 (Kennedy, J., concurring). The *White* Court explained "[d]ebate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms," making "it all the more imperative that [candidates] be allowed freely to express themselves on matters of current public importance."[19] *Id.* at 781-82 (cleaned up and citations omitted); *see also Eu v. S. F. Cty. Democratic Cent. Comm.*,

election" from "announc[ing] their views on disputed legal or political issues"). *Stretton*, however, reached a different result than *White*, holding Pennsylvania had a compelling interest in the integrity of its judiciary and the challenged provision of the Code was narrowly tailored to serve that interest. *See Stretton*, 944 F.2d at 142-44. As the CJD observed below, "[t]he precedential or persuasive value of *Stretton* post-*White* is doubtful." *In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 67.

[19] Pennsylvania's Code of Judicial Conduct reflects this principle by carving out added freedoms for judicial candidates. *See* Pa. Code of Judicial Conduct, Canon 4, Rule 4.2(B) ("A candidate for elective judicial office may, unless prohibited by law, and not earlier than immediately after the General Election in the year prior to the calendar year in which a person may become a candidate for such office: . . . (3) publicly endorse or speak on behalf of, or publicly oppose or speak in opposition to, candidates for the same judicial office for which he or she is a judicial candidate, or publicly endorse or speak on behalf of candidates for any other elective judicial office appearing on the same ballot; (4) attend or purchase tickets for dinners or other events sponsored by a political organization or a candidate for public office; (5) seek, accept, or use endorsements from any person or organization; (6) contribute to a political organization or candidate for public office; (7) identify himself or herself as a member or candidate of a political organization; and (8) use court facilities for the purpose of taking photographs, videos, or other visuals for campaign purposes to the extent such facilities are available on an equal basis to other candidates for such office.").

489 U.S. 214, 223 (1989) ("the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office"), *quoting Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). Restricting a **candidate's** speech would amount to the government "select[ing] which issues are worth discussing or debating in the course of a political campaign." *White*, 536 U.S. at 782, *quoting Brown v. Hartlage*, 456 U.S. 45, 60 (1982); *see also Williams-Yulee*, 575 U.S. at 444 ("A State may restrict the speech of a judicial **candidate** only if the restriction is narrowly tailored to serve a compelling interest.") (emphasis added). For that reason, the High Court has "never allowed the government to prohibit candidates from communicating relevant information to voters during an election." *White*, 536 U.S. at 782. But we would be extending *White* beyond its tenets by applying it to restrictions on speech by a sitting judge made outside the context of a campaign.

Indeed, courts applying strict scrutiny to judicial speech have overwhelmingly done so in the context of judicial elections. *See Wolfson v. Concannon*, 811 F.3d 1176, 1181 (9th Cir. 2016) (applying strict scrutiny to "Arizona's Personal Solicitation Clause," which prohibited Wolfson, "**while running for judicial office**, from personally soliciting funds for his own campaign") (emphasis added); *Carey v. Wolnitzek*, 614 F.3d 189, 193 (6th Cir. 2010) ("When the government suppresses **election speech** based on its content . . . the most rigorous form of constitutional second-guessing applies, and no categorical exemption from the First Amendment spares the government from this burden. In modern America, judicial elections are no less relevant to the public policy concerns of the citizenry than legislative elections[.]") (emphasis added); *Weaver v. Bonner*, 309 F.3d 1312, 1321 (11th Cir. 2002) ("the Supreme Court's decision in *White* suggests that the standard for **judicial elections** should be the same as the standard for legislative and executive elections") (emphasis added); *Earls v. N.C. Judicial Standards Comm'n*, 703

F.Supp.3d 701, 725 (M.D.N.C. 2023) ("A state may restrict the speech of a **judicial candidate** only if the restriction 'further[s] a compelling interest and [is] narrowly tailored to that end.'") (emphasis added), *quoting S.C. Freedom Caucus v. Jordan*, 677 F.Supp.3d 352, 371 (D.S.C. 2023); *In re Kinsey*, 842 So.2d 77, 85-86 (Fla. 2003) (applying strict scrutiny when reviewing restrictions on a judge's "**campaign** speech") (emphasis added).

Admittedly, some courts have gone the other way. As earlier noted, New York has applied strict scrutiny in the context of a sitting judge. *See In re Raab*, 793 N.E.2d at 1289 (considering rules that "generally prohibit judges and judicial candidates from engaging in certain political activities"). However, *Raab* did not express an opinion on whether strict scrutiny was the appropriate test. Rather, *Raab* simply assumed without deciding that strict scrutiny was the applicable standard. *See id.* at 1290 ("we assume without deciding that strict scrutiny analysis is appropriate to review petitioner's First Amendment claim"). Thus, *Raab* does not help us resolve the issue presented here.

The decision in *Matter of Disciplinary Proceedings Against Sanders*, 955 P.2d 369 (Wash. 1998), offers another exception. There, the Washington Supreme Court acknowledged a judicial candidate's speech carries more constitutional import than the speech of a sitting judge. *See id.* at 374 ("The distinction between a candidate for judicial office and a sitting judge is that the candidate has an additional attribute of free expression to weigh in the balance — that of the electorate's right to be informed."). Nevertheless, the court saw "no reason why the same principles should not apply to speech by a sitting judge, albeit with somewhat less force." *Id.* at 375. Accordingly, citing the Third Circuit's decision in *Stretton*, the court required the State to satisfy strict scrutiny. *See id.* Critically, however, *Sanders* did not mention the High Court's decision in *Pickering*, much less explain why it found *Pickering* distinguishable. This limits *Sanders*' persuasive value with respect to the issue before us.

We also observe some courts have held the proper test lies somewhere between *White* and *Pickering*. West Virginia, for one, adopted an amalgamated approach in *Matter of Hey*, 452 S.E.2d 24 (W. Va. 1994). The *Hey* Court reasoned "[t]he State has compelling interests in maintaining the integrity, independence, and impartiality of the judicial system — and in maintaining the appearance of the same — that justify unusually stringent restrictions on judicial expression, both on and off the bench." *Id.* at 30; *see id.* ("a 'state may restrict the speech of elected **judges** in ways that it may not restrict the speech of other elected officials'") (emphasis in original), *quoting Scott v. Flowers*, 910 F.2d 201, 212 (5th Cir. 1990). Accordingly, *Hey* adopted a balancing test, with a twist. *See id.* ("the public employee-free speech cases provide an appropriate analogy in this case because the clash of interests requires us to engage in a similar balancing process"). "That is: the State may accomplish its legitimate interests and restrain the public expression of its judges through narrowly tailored limitations where those interests outweigh the judges' free speech interests." *Id.* at 31.

New Jersey has taken still another approach. *See In re Inquiry of Broadbelt*, 683 A.2d 543 (N.J. 1996) (*per curiam*). The *Broadbelt* Court noted "judges are in a unique position, and 'must accept restrictions of their personal activities that other citizens might find burdensome and intrusive.'" *Id.* at 549, *quoting In re Blackman*, 591 A.2d 1339, 1341 (N.J. 1991) (*per curiam*). Thus, in New Jersey, "the regulation of a judge's speech will be upheld if it furthers a substantial governmental interest unrelated to suppression of expression, and is no more restrictive than necessary." *Id.* at 552. "Avoiding material prejudice to an adjudicatory proceeding is one example of a governmental interest sufficient to uphold restrictions on a judge's speech." *Id.* New Jersey borrowed its standard from the High Court's decision in *Gentile*, *supra*, which addressed restrictions on a lawyer's speech during the pendency of a trial. The *Gentile* Court deemed the

"substantial likelihood of material prejudice" standard an appropriate balance between "the State's interest in the regulation of a specialized profession" and lawyers' First Amendment rights. 501 U.S. at 1073-75; *see id.* at 1071 ("in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed"); *id.* at 1073 (even outside the courtroom, the High Court's "decisions dealing with a lawyer's right under the First Amendment to solicit business and advertise, contrary to promulgated rules of ethics, have not suggested that lawyers are protected by the First Amendment to the same extent as those engaged in other businesses").

Ultimately, we are most persuaded by the approach taken in *Siefert v. Alexander*, 608 F.3d 974 (7th Cir. 2010), *cert. denied*, 563 U.S. 983 (2011), where the Seventh Circuit "attempt[ed] to harmonize the[ ] two strains of First Amendment law" created by *White* and *Pickering*. *Id.* at 981. Like Judge Cohen, Judge Siefert was elected to the bench after years working in politics, including service as a delegate to the Democratic National Convention. Judge Siefert challenged provisions of Wisconsin's Code of Judicial Conduct barring him from: (1) identifying himself as an active member of the Democratic Party in response to candidate questionnaires; and (2) endorsing partisan candidates for executive office.[20] The Seventh Circuit applied *White* to the former and *Pickering* to the latter. In making that distinction, the Seventh Circuit drew "a dividing line between . . . speech about the judge's own campaign" and "a judge's entry into the political arena on behalf of his partisan comrades." *Id.* at 984. The Seventh Circuit explained speech by candidates about their qualifications for public office is "at the core of our First Amendment freedoms[.]" *Id.* at 981, *quoting White*, 536 U.S. at 774; *see also id.* at 982 ("The state does not have a compelling interest in preventing candidates from announcing their views

---

[20] Judge Siefert also challenged a provision barring him from personally soliciting contributions for his judicial campaign. Since campaign finance regulation is not relevant to the issue presented here, we will not discuss it further.

on legal or political issues, let alone prohibiting them from announcing those views by proxy [of party membership].").  An endorsement, by contrast, "is less a judge's communication about his qualifications and beliefs than an effort to affect a separate political campaign, or even more problematically, assume a role as political powerbroker." *Id.* at 984*; see id.* at 987 ("[An endorsement] suggests that the political party of the endorsing judge is behind the candidate.  In that sense, the judge becomes a spokesperson for the party.").  In the Seventh Circuit's view, that difference "justifie[d] a more deferential approach to government prohibition of these endorsements."  *Id.* at 984; *see also Bauer v. Shepard*, 620 F.3d 704, 713 (7th Cir. 2010) (explaining that "[w]hen a state requires judges to stand for office, it cannot insist that candidates remain silent about why they rather than someone else should be elected" but concluding this rationale does not extend to "political races other than the judge's own"), *cert. denied*, 563 U.S. 974 (2011).  "While . . . a judge who takes no side on legal issues is not desirable, a judge who takes no part in political machinations is."  *Siefert*, 608 F.3d at 986.

The Seventh Circuit rejected Judge Siefert's argument that "[judges] are more akin to legislative actors" than public employees.  *Id.* at 984.  Although *Pickering* and its antecedents "all concern public employees," the Seventh Circuit noted the government's ability to regulate employees in those cases was "not solely dependent on its authority as an employer."  *Id.* at 985.  *Pickering* also considered the government's "duty to promote the efficiency of the public services it performs."  *Id.*  In Judge Siefert's case, the Seventh Circuit was "not concerned merely with the efficiency of [government] services, but that the work of the judiciary conforms with the due process requirements of the Constitution[.]"  *Id.*  In the Seventh Circuit's view, the distinction "tip[ped] the balance even more firmly in favor of the government regulation."  *Id.*  Notwithstanding the fact elected judges, like legislators, are accountable to voters,

> [a] judge must also be accountable to [his or] her responsibilities under the Fourteenth Amendment. It is small comfort for a litigant who takes her case to state court to know that while her trial was unfair, the judge would eventually lose an election, especially if that litigant were unable to muster the resources to combat a well-financed, corrupt judge around election time.

*Id.* Accordingly, outside the context of a judge's own election, the Seventh Circuit adopted the balancing test.

We find *Siefert*'s rationale compelling.[21] Here, Judge Cohen was not campaigning for retention at the time he wrote his social media posts. Nor could he be, as Pennsylvania law required him to retire at the age of seventy-five, before his ten-year term in office expired. Consequently, *White*'s interest in protecting the electorate's need for an open debate about the qualifications of judicial candidates plays no role in this case. In this context, stripped of the heightened importance of an election, we believe the *Pickering* balancing test is the appropriate standard to review restrictions on a sitting judge's speech. Therefore, if a sitting judge speaks only on a matter of personal interest, and not a matter of public concern, then the Commonwealth has wide latitude in restricting

---

[21] We observe the Seventh Circuit is not alone in its approach. Indeed, three years prior, the Supreme Court of New Mexico applied the balancing test to New Mexico's version of the endorsement clause. *See In re Vincent*, 172 P.3d 605, 607 (N.M. 2007) ("While *White* is widely seen as changing the legal landscape regarding the free speech rights of judges, it is factually distinguishable from this case . . . *White* examined the free speech rights of a judicial candidate involved in his own election, whereas this case involves the free speech rights of a sitting judge to endorse another's political candidacy."). A handful of states have reached a similar result. *See Osborne*, 11 So.3d at 113 ("Traditionally, this Court, in assessing whether speech by a member of the judiciary is protected political speech, has applied the two-prong test promulgated in *Pickering*[.]"); *In re Davis*, 82 S.W.3d 140, 149 (Tex.Spec.Ct.Rev. 2002) (applying the *Pickering* test, but concluding a judge's comment to the media did not address a matter of public concern); *Broadman v. Comm'n on Judicial Performance*, 959 P.2d 715, 727 (Cal. 1998) ("Because the state's interests in protecting the integrity of the judiciary and in maintaining public confidence in the judiciary are at least as strong as its interest in promoting the efficiency of public services generally, we conclude that the First Amendment protection for public comment on pending cases by judges is no more protective of judges, who are also public employees, than the standard articulated by the United States Supreme Court for evaluating the regulation of public employee speech generally.").

its judge's speech.[22]  If, however, a sitting judge speaks on a matter of public concern, then the court must balance the Commonwealth's interest in preserving the efficient administration of justice against the judge's interest in making the statement.

To be sure, *Pickering* is not a perfect fit.  The High Court in that case spoke specifically of government employees, and "[j]udges are not typical, run-of-the-bureaucracy employees[.]"  *Hey*, 452 S.E.2d at 30.  However, in some ways, "the State's interests in regulating judicial conduct are . . . of a greater weight than those implicated in the usual government employment case."  *Id.*; *see also In re Bruno*, 101 A.3d at 684 n.27 ("In drafting the[ Code of Judicial Conduct], we persist in the aspiration that the judicial office summons in those who serve the highest quality of professionalism and personal comportment."); *Raab*, 793 N.E.2d at 1219 ("There is hardly a higher governmental interest than a State's interest in the quality of its judiciary."), *quoting Matter of Nicholson v. State Comm'n on Judicial. Conduct*, 409 N.E.2d 818, 822 (N.Y. 1980); *In re Code of Judicial Conduct*, 603 So.2d 494, 497 (Fla. 1992) ("Judges and judicial employees are treated differently from other public servants because there is 'something special in the judicial role.'"), *quoting* Allan Ashman *et al.*, *Judges in an Age of Mistrust: Morial and the Policy of Required Resignation*, 54 TUL. L. REV. 382, 414 (1980).

"An independent and honorable judiciary is indispensable to justice in our society." *Williams-Yulee*, 575 U.S. at 439 (citation omitted).  The efficiency of the judiciary depends not only on the reality of impartiality, but also its reputation for impartiality.  *See Williams v. Pennsylvania*, 579 U.S. 1, 16 (2016) ("Both the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the

---

[22] The CJD's decision in *In re Eakin* offers one example.  Former Justice Eakin sent emails on his government-supplied computer containing "nudity, gender stereotypes, and ethnic stereotypes" — paradigmatic representations of speech **not** addressing a matter of public concern.  *In re Eakin*, 150 A.3d at 1057.

rule of law itself."). "Unlike the executive or the legislature, the judiciary 'has no influence over either the sword or the purse; . . . neither force nor will but merely judgment.'" *Williams-Yulee*, 575 U.S. at 445, *quoting* The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961). "The judiciary's authority therefore depends in large measure on the public's willingness to respect and follow its decisions." *Id.* at 445-46. Moreover, judges, unlike the average government employee, are bound by due process, which heightens the importance of a judge being cautious in his speech. *See Siefert*, 608 F.3d at 984 ("restrictions on judicial speech may, in some circumstances, be required by the Due Process Clause"). So even though a judge is not, strictly speaking, an "employee" of the Commonwealth, the Commonwealth arguably has a greater interest in regulating the speech of its sitting judges than the bureaucrats typically associated with *Pickering*, which justifies a deferential standard of review.[23]

---

[23] We are not persuaded by the Fifth Circuit's contrary decision in *Jenevein*, *supra*. There, the court applied strict scrutiny when reviewing restrictions on a sitting judge's speech to his constituency, reasoning that the judge was "an elected official, about whom the public is obliged to inform itself[.]" *Jenevein*, 493 F.3d at 557; *see id.* ("as an elected holder of state office, his relationship with his employer differs from that of an ordinary state employee"). In the Fifth Circuit's view, "if the State chooses to tap the energy and the legitimizing power of the democratic process in the election of judges, it must accord the participants in that process . . . the First Amendment rights that attach to their roles." *Id.* at 558, *quoting White*, 536 U.S. at 788 (brackets omitted). We agree with this statement. However, in our view, judges only enjoy "the First Amendment rights that attach to **their** roles" as part of the judiciary, *id.* (emphasis added), not the First Amendment rights that attach to a legislative or executive role. "Judges are not politicians, even when they come to the bench by way of the ballot." *Williams-Yulee*, 575 U.S. at 437; *see id.* at 437-38 ("a State's decision to elect its judiciary does not compel it to treat judicial candidates like campaigners for political office"); Pa. Code of Judicial Conduct, Canon 4, Rule. 4.1, cmt. 7 ("The role of a judge is different from that of a legislator or executive branch official, even when the judge is subject to public election."). Significantly, while politicians are expected to be "responsive to the preference of their supporters" after the election, judges are not. *Williams-Yulee*, 575 U.S. at 446. A judge instead "striv[es] to be 'perfectly and completely independent, with nothing to influence or controul him[.]'" *Id.* at 447, *quoting* Address of John Marshall, in Proceedings and Debates of the Virginia State Convention of 1829-1830, 616 (1830). For that reason, "[c]ampaigns for judicial office must be conducted differently from campaigns for other offices." Pa. Code of Judicial Conduct, (continued…)

Therefore, unless or until the United States Supreme Court resolves this open question of law, we will apply a balancing test when reviewing First Amendment claims challenging restrictions on sitting judges' speech outside the context of their own election. The first prong of the balancing test asks whether the speech addresses a matter of public concern — a question that requires courts to consider "the content, form, and context" of the contested statement. *Connick*, 461 U.S. at 147. Generally, speech addresses a matter of public concern "if it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 886 (3d Cir. 1997), *quoting Connick*, 461 U.S. at 146. If the speech implicates a matter of public concern, thus satisfying the first prong, then the second prong requires us to "find the balance between the state's interest and the judge's." *Siefert*, 608 F.3d at 985. However, "narrow tailoring is not the requirement; the fit between state interest and regulation need not be so exact." *Id*. In this context, this means we must weigh the Commonwealth's interest in protecting the efficiency of the administration of justice, including the independence, integrity, and impartiality of the judiciary, against the judge's interest in speaking.

## C. Application

With the test resolved, we move to application. Here, we need not dwell on the first prong because the JCB does not dispute that Judge Cohen's partisan political social

---

Canon 4, Rule. 4.1, cmt. 7  In short, while the public has the right to be informed about a judge's performance once he or she takes the bench, it does not have a right to hear the type of partisan political commentary from a judge that is expected today of a governor or state representative. *See Raab*, 793 N.E.2d at 1292-93 (noting "there is a heightened risk that the public, including litigants and the bar, might perceive [elected] judges as beholden to a particular political leader or party after they assume judicial duties"). Since the role of judges is fundamentally different than that of politicians, the standard we adopt must reflect the judiciary's unique role.

media posts "involved matters of public concern." Appellee's Brief at 69. This case hinges instead on the second prong of the balancing test.[24]

To properly conduct that analysis, we must clarify what was troubling about Judge Cohen's social media posts. The CJD's concern was not just that Judge Cohen publicly posted his personal, political views, but that he posted so regularly and one-sidedly that he appeared to be "an advocate for the Democratic Party[.]" *In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 52. It was not just the topics of the posts, but "their volume and their tone [that] undermine[d] the appearance of impartiality required of the judiciary." *Id.* at 38. On his Facebook account, Judge Cohen advocated for legislation, such as the Build Back Better Bill that was then being promoted by the Democratic Party,[25] cheered on

---

[24] Judge Cohen misconstrues the balancing test in his brief. He claims, "under *Pickering*, First Amendment protection extended only to employees' statements of public concern not to private employment matters." Appellant's Brief at 77. Facially, that is correct. The problem is Judge Cohen stops there and omits the "balancing" portion of the balancing test. He believes as long as a judge is speaking on a matter of public concern, "[t]he Judicial Conduct Board cannot penalize extra judicial speech that is not connected with a judge's duties or discussions about his employment." *Id.* That is simply not the case. *See Rankin*, 483 U.S. at 387 (if the "statement addressed a matter of public concern, *Pickering* next requires that we balance [the speaker]'s interest in making her statement against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees'"), *quoting Pickering*, 391 U.S. at 568.

[25] *See In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 30-31 ("Good night, Kevin McCarthy. Good night moon. No matter how long Kevin talks, we'll have House passage of Build Back Better soon."), *quoting* JCB Ex. 8, ¶60; *id.* at 31 ("At 8:00 a.m., [U.S.] House returns to session, delayed by Kevin McCarthy speech of record length, to pass Build Back Better bill and improve many, many American lives."), *quoting* JCB Ex. 8, ¶61.

Democratic politicians,[26] impliedly endorsed a candidate for congressional office,[27] touted his own legislative achievements as a Democrat,[28] and criticized the policies of predominately Republican legislatures.[29] An ordinary citizen comparing Judge Cohen's

---

[26] *See id.* at 10 ("Today is President Joe Biden's Birthday. Many people his age is [sic] impaired. But he has proven to be an excellent President. His experience enables him, and does not wear him down. I look forward to many more achievements!"), *quoting* JCB Ex. 8, ¶3; *id.* at 11 ("My friend and former House colleague Josh Shapiro, whose father Dr. Steve Shapiro was a classmate of mine at Central High, has been elected P[A]'s Governor. I have no doubt he is up to the job."), *quoting* JCB Ex. 8, ¶6; *id.* ("My former legislative colleague Kenyatta Johnson, now completing his 3rd term in the Philly City Council[,] has been found — along with his wife Dawn Chavous — to be not guilty on all charges in federal court today by a jury verdict. . . . Friends and admirers can choose to contribute to a defense fund, if he has set one up."), *quoting* JCB Ex. 8, ¶8; *id.* ("Philly DA Krasner, in switch of tactics, now demands to testify before P[A] House Committee seeking evidence of wrongdoing to begin impeachment proceedings. Good move!"), *quoting* JCB Ex. 8, ¶9; *id.* at 16-17 ("More people are employed in [the U.S.] than ever before, showing a very strong economy, and strengthening Social Security System. It's time for critics to re-evaluate this Administration."), *quoting* JCB Ex. 8, ¶22.

[27] *See id.* at 13-14 ("I remember journalistic anger at Roger Maris & Eugene McCarthy for becoming national heroes with heroic achievements. John Nichols' hit job against Liz Cheyney [sic] in [ ] The Nation is of the same sad kind. . . . As a judge, I am not permitted to endorse or otherwise back any candidate for anything. But I strongly disbelieve that good works by anyone should subject them to harsh criticism while those who do far fewer good things remain totally ignored."), *quoting* JCB Ex. 8, ¶15.

[28] *See id.* at 16 ("With allies among the leaders of both parties, I spearheaded Pennsylvania's pioneering 2015 law against the Boycott, Divestment and Sanctions movement seeking [to] deprive Israel of foreign trade on a state-by-state basis. A federal appeals court has recently ruled in favor of the constitutionality of a similar law in Arkansas."), *quoting* JCB Ex. 8, ¶21; *id.* at 18-19 ("Despite the support of [John] Baer, Gov. Tom Wolf, and many others, the legislature still has not raised the minimum wage above the current $7.25 level. When P[A] raised the minimum wage to $7.15 (10 cents less than the federal level which ultimately followed), under my leadership in 2006, I immediately advocated that it should soon go up to $8.00."), *quoting* JCB Ex. 8, ¶27.

[29] *See id.* at 19 ("Texas calls itself the Lone Star state, due to its brief experience as a separate country, after winning independence from Mexico. But in these days of five-star ratings, and Texas' passage of a variety of dubious laws, being a one star takes on a new — and accurate — meaning."), *quoting* JCB Ex. 8, ¶28; *id.* at 29 ("The state that gave us Estes Kefauver and two Al Gores is now trying to make knowledge of black history illegal. Shameless retrogression!"), *quoting* JCB Ex. 8, ¶54.

posts with the posts of our state politicians would likely see little distinction. Compounding the problem, Judge Cohen posted his political views on a page identifying himself — both in photo and text — as a judge, *see id.* at 41-42, erasing any chance readers would not connect the dots between his account and the judiciary.[30]

When viewed in that light, the question before us is an easy one to resolve. The Commonwealth's interest in protecting the efficiency of the administration of justice, including the independence, integrity, and impartiality of the judiciary, outweighed Judge Cohen's interest in continuing to act as a spokesperson for the Democratic Party after he took the bench. As explained above, the efficiency of the administration of justice depends on both the reality **and appearance** of impartiality. *See Williams*, 579 U.S. at 16. "[P]articipation in politics undermines the appearance of impartiality[.]" *Bauer*, 620 F.3d at 711. As the Florida Supreme Court eloquently explained:

> The great mass of the people think that judges are different, that their special relationship to the law is what makes them different, that they are not merely political authorities, weighing and balancing interests, but legal authorities, guided and restrained by the law. It is this conviction, more than anything else, which compels the people to obey orders of the court. . . . [T]o the extent that judges are seen as political rather than judicial, to that extent they lose their authority and the power they now have to induce obedience to their orders. If judges are stripped of the robes of the law — or if, in the foolish pursuit of political power, they strip themselves of the robes of the law — the people will cease to accept the authority of court decisions, law enforcement officers will be less ready to enforce court

---

[30] Judge Cohen claims if a state judicial candidate can criticize prior case law in an election, as permitted in *White*, "then obviously, Judge Cohen possesses the right to discuss, in a proper fashion, student loan debt legislation, relief [sic], inflation, the January 6th Committee investigation and other matters of public concern." Appellant's Brief at 65. But this analogy is inapt. If an individual is seeking elected judicial office, then his or her opinion of that court's prior case law is precisely the type of information voters are seeking in evaluating his or her views and fitness for the role. *See White*, 536 U.S. at 778 ("Proof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias."), *quoting* Laird, 409 U.S. at 835. Not only is the speech involved here of an entirely different kind, but, again, and critically, Judge Cohen was not running in an election or even eligible for retention at the time he made it.

orders, legislators will be more ready to curb judicial powers, and the judges will wonder where their power went.

*In re Code of Judicial Conduct*, 603 So.2d at 497-98, *quoting* Robert A. Goldwin, *Comments to Chapter 1, in* THE JUDICIARY IN A DEMOCRATIC SOCIETY, 19-20 (Leonard J. Theberge ed., 1979). Thus, Judge Cohen did not put just his own reputation at risk. When, as here, a sitting judge adopts the persona of a political party spokesperson and abuses the prestige of his office to advance that party's interests, he detracts from the reputation of the entire judiciary. The Commonwealth has not just a right, but a duty, to regulate that behavior. Accordingly, we conclude the CJD properly balanced the interests of the Commonwealth and Judge Cohen in rejecting Judge Cohen's free speech claim. Although we respect Judge Cohen's desire, as a private citizen, to engage in politics and express his opinion on matters of public concern, once Judge Cohen assumed the bench, he bound himself to comply with the Pennsylvania Constitution and the Code, including the Code's restrictions on political activity.

To be clear, our holding does not mean judges will "be bound and gagged once they . . . go home" from work. Appellant's Brief at 62. Nor are we saying judges "can never comment on any matter of importance without it being called political speech[.]" *Id.* at 83. "Judges are uniquely qualified to engage in extrajudicial activities that concern the law, the legal system, and the administration of justice," and are therefore encouraged to write or speak — even on social media — on "appropriate" matters of public concern. Pa. Code of Judicial Conduct, Canon 3, Rule 3.1, cmt. 1 Indeed, as the CJD noted, "[s]ocial media can be positive for a judge to use professionally." *In re Cohen*, No. 1 J.D. 2023, 5/3/24, at 63. When employed mindfully,

> [social media] can be used to share information on the role of judges and the judicial system. It can provide insight into court procedures and encourage *pro bono* activities. It can also be used to show a judge's involvement in educational organizations along with civil and community activities. Judges can promote their activities and recognitions received.

*Id.* at 64. Social media can be used by judges for personal reasons as well. *See id.* ("Judges can post photos of themselves and their family at local restaurants, events or on vacations as long as such photos do not violate any judicial canons."). Therefore, sitting judges, like many other citizens, must ensure their social media use comports with the rules of the position they have voluntarily attained or the organization they have voluntarily chosen to join. "A judge should weigh this before he [or she] accepts [ ] office." *In re Troy*, 306 N.E.2d 203, 235 (Mass. 1973).

### III. Conclusion

In sum, although restrictions on a judicial candidate's speech must satisfy strict scrutiny, we hold restrictions on a sitting judge's speech, outside the context of his or her own election, need only satisfy a more deferential balancing test. Under this balancing test, a reviewing court must decide whether the judge's speech addressed a matter of public concern. If the answer is yes, then the court must balance the Commonwealth's interest in protecting the efficiency of the administration of justice, including the independence, integrity, and impartiality of the judiciary, against the judge's interest in making the statement. If, however, the answer is no, then the Commonwealth has wide latitude in managing the judiciary, without intrusive oversight in the name of the First Amendment. Here, the parties agree Judge Cohen's Facebook posts addressed matters of public concern. Nevertheless, we conclude the Commonwealth's interest in protecting the efficiency of the administration of justice outweighed Judge Cohen's interest in posting partisan political content on Facebook where the volume and tone of his posts cast him as little more than a spokesperson for the Democratic Party. Accordingly, we affirm the order of the CJD suspending Judge Cohen for the remainder of his term of service.

Chief Justice Todd and Justices Donohue, Wecht, Mundy, and Brobson join the opinion.

Justice Wecht files a concurring opinion.

Justice McCaffery did not participate in the consideration or decision of this matter.